AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the

Northern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| GLENDON SCOTT CRAWFORD and | ) | Case No. |
| ERIC J. FEIGHT | ) | 1: 13 – m j · 3 1 2  C F H |
| | ) | |
| | ) | |
| Defendant(s) | ) | |

**ORIGINAL**

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

JUN 1 8 2013

LAWRENCE K. BAERMAN, CLERK
AT BANY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ (see below) _____ in the county of _____ Albany _____ in the
_____ Northern _____ District of _____ NY and elsewhere _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2339A | Conspiracy to provide material support, or resources, intending that they be used in preparation for, or in carrying out, a violation of Title 18, U.S.C. § 2332a (use of a weapon of mass destruction), from on or about April 2012 through June of 2013. |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

FBI Special Agent Geoffrey Kent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 06/17/2013 _____

_____
Judge's signature

City and state: _____ Albany, New York _____

Hon. Christian F. Hummel, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANTS

### INTRODUCTION

GEOFFREY KENT, being duly sworn, deposes and states as follows:

### Agent Background:

1.)   I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Chapter 119 of Title 18 of the United States Code, including Section 2516 of that Title.

2.) I have been a Special Agent of the Federal Bureau of Investigation (hereinafter "FBI") for over 13 years and am currently assigned to the Albany Field Office, where I have been the Coordinator for Weapons of Mass Destruction ("WMD") program, which includes responding to and investigating WMD threats, for approximately six years.  My experience as an FBI agent includes being assigned to conduct criminal investigations in the Northern District of New York and elsewhere concerning WMD, domestic terrorism, destructive devices, and health care fraud. Many of these investigations have resulted in the prosecution and conviction of the defendants.

3.)   During my employment with the FBI, I have received training in both investigative procedures and evidence recovery. As  a  federal  agent,  I  am  authorized  to  investigate violations  of  the  laws  of  the  United  States  and  to  execute search warrants and arrest warrants issued under the authority of  the  United  States.  In  my  work  as  an  FBI  Special  Agent, particularly in domestic terrorism investigations and with the JTTF, I regularly work with and consult other Special Agents and law  enforcement  officers  who  have  participated  in  state  and federal investigations.

**Criminal Complaint and Arrest Warrants Sought:**

    4.)  I  submit  this  affidavit  in  support  of  a  criminal complaint and arrest warrant(s) charging GLENDON SCOTT CRAWFORD and ERIC J. FEIGHT with conspiring to provide material support, or resources, intending that they be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 2332a (use of a weapon  of  mass  destruction),  from  on  or  about  April  2012 through June 2013, in violation of 18 U.S.C. § 2339A.

    5.) The facts set forth in this affidavit are based on my own investigation, together with information I obtained from a variety  of  sources,  including  other  law  enforcement  officials, official  FBI  records,  analysis  of  subpoena  or  public  records, surveillances,  Court  authorized  Title-III  intercepts  of telephone,  SMS,  and  oral  communications,  and  pen  register information.

    6.)  I  have  not  included  every  fact  regarding  this investigation in this affidavit. I have only set forth the facts which  I  believe  are  necessary  to  establish  probable  cause  to believe that the above crime has been committed by CRAWFORD and FEIGHT.

## SUMMARY OF INVESTIGATION

    7.) The essence of CRAWFORD's scheme is the creation of a mobile, remotely operated, radiation emitting device capable of killing human targets silently and from a distance with lethal doses of radiation. A central feature of CRAWFORD's weaponized radiation device is that the target(s), and those around them, would not immediately be aware they had absorbed lethal doses of radiation, and the harmful effects of that radiation would not become apparent until days after the exposure.

    8.)  CRAWFORD,  conspiring  with  FEIGHT,  and  assisted  by others, has supervised and successfully completed the building, testing, and demonstration of a remote initiation device. He now (on or about June 18, 2013) plans to integrate that remote initiation  device  into  a  truck-borne,  industrial-grade  x-ray system,  thus  weaponizing  that  system  and  allowing  it  to  be

2

turned on and off from a distance and without detection. Once completed and fully weaponized, CRAWFORD has described his intention to provide the functioning radiation emitting device to individuals he believes will use it to injure or kill people deemed by CRAWFORD to be undesirable (CRAWFORD specifically has identified Muslims and several other individuals/groups as targets). CRAWFORD has researched targets and locations for the first uses of his radiation emitting device.

9.) Beginning in at least April of 2012, CRAWFORD actively solicited individuals and groups to finance his acquisition of a sufficiently powerful x-ray system to carry out his scheme. After several unsuccessful solicitations, CRAWFORD soon found two separate groups with the apparent means and ability to get for him the type of x-ray system he wanted for his scheme. At CRAWFORD's request, these two separate groups each have obtained, and are prepared to make available to him, an x-ray system that he selected or has approved. CRAWFORD has made clear he intends, as soon as he has access to the x-ray systems, to connect his remote initiation device into the control panels of an x-ray systems and render it remotely-operable as a lethal radiation emitting device. Fortunately, law enforcement will control the timing of those events, as both groups presently dealing with CRAWFORD and his scheme are composed of Undercover Employees ("UCEs") and a Confidential Human Source ("CHS").

10.) Within approximately six weeks of CRAWFORD's attempts in April of 2012 to solicit financing for his radiation emitting device scheme from two Jewish organizations, the investigation had a CHS in place and CRAWFORD had met with that CHS, describing his scheme and his radiation emitting device concept to the CHS (all meetings and interactions with the CHS and UCEs identified in this affidavit were recorded, many with audio and video, except where noted). Following that meeting, an FBI UCE was introduced to CRAWFORD by the CHS. That combination – the CHS and that UCE (identified as UCE # 1) – forms one of the two groups currently dealing with CRAWFORD. That first group is identified here as the "first branch" of the investigation.

11.) In August of 2012, CRAWFORD traveled by car (unsolicited and without any government role or direction)from his home near Albany, NY to North Carolina to meet with an

individual who is believed to be a ranking member of the Ku Klux Klan ("KKK"). At the meeting, CRAWFORD instructed on radiation physics, identified his planned radiation emitting device, presented his scheme to this official of the KKK, and solicited funds from the KKK (through this individual) for his scheme (hereinafter identified as the "CW"). The CW told the FBI about his meeting with CRAWFORD. Several weeks later (early October 2012), CRAWFORD drove his car from his home outside Albany, NY to Greensboro, North Carolina to meet with the CW and two individuals the CW introduced to CRAWFORD as Southern businessmen of means who were associated with the KKK. Two individuals assumed those roles, but were FBI UCEs, referenced in this affidavit as UCE #2 and UCE #3 (this second group dealing with CRAWFORD, composed of UCE #2, UCE #3, and the CW, is hereinafter referred to in this affidavit as the "second branch"). CRAWFORD described to UCEs #2 and #3 his radiation emitting device scheme, the science and concepts underlying that device, his remote initiation device, mobilizing the radiation device, and discussed operational security concerns. CRAWFORD again solicited money to finance his scheme (primarily to fund the purchase or acquisition of an industrial strength x-ray system). Both the first and second branches have assisted CRAWFORD with financing and obtaining of parts.

12.) From that time up through June 15, 2013 CRAWFORD has steadily worked to design, acquire the parts for, build, and test a remote initiation device to remotely turn on and off an industrial x-ray system powerful enough to kill humans from a distance, and to render all of that equipment mobile by fitting it into a truck. Experts have advised the investigation that the remote initiation device and x-ray systems CRAWFORD plans to weaponize would produce a lethal, and functioning, remotely controlled radiation emitting device. CRAWFORD recruited FEIGHT to assist him with the design and construction of a remote initiation device. CRAWFORD knows FEIGHT through their associations with General Electric in Schenectady, NY. CRAWFORD is employed there as an industrial mechanic and FEIGHT is an outside contractor regularly working with, and visiting, that GE facility. FEIGHT has mechanical and engineering skills, and has worked for years at small businesses outside of Albany, NY that do industrial automation work. With assistance from CRAWFORD,

4

FEIGHT has designed, identified and received needed parts, built, and successfully tested a working remote initiation device to remotely control an industrial x-ray system - which CRAWFORD later demonstrated - and that remote initiation device is powered by a plug-in cigarette lighter electrical source, consistent with CRAWFORD's requirement to put the whole system into a truck so that it can be used against human targets. FEIGHT is aware of CRAWFORD's plan that the remote initiation device be used to remotely control an industrial x-ray system to injure or kill human targets deemed undesirable, and, on November 14, 2012, FEIGHT met with CRAWFORD, UCE #2, and UCE #3 near Albany, NY to discuss the purpose of the project, assign tasks, and confirm his capability to design and build a remote initiation device.  Over the course of several months, and using a network of others as proxies, and at times acting himself under false names, CRAWFORD caused to be ordered, delivered, purchased, held, and eventually distributed to him and FEIGHT, the parts needed to build the remote initiation device.

13.) In December of 2012, the government applied for and received judicial authorization, pursuant to Title III, to intercept wire and electronic communications over CRAWFORD's cellular telephone (hereafter the "Crawford Telephone").  By January of 2013, CRAWFORD had acquired, surreptitiously, a second cellular telephone - this one a pre-paid TracFone that he advised UCEs #2 and #3, and FEIGHT, was to be used exclusively for communications regarding his radiation emitting device scheme (this cellular telephone is hereafter referred to in this affidavit as the "Crawford Telephone #2").  Communications to, from and over the Crawford Telephone #2 also were intercepted pursuant to judicial authorization and order, again pursuant to Title III.

14.) On May 20, 2013, CRAWFORD successfully tested and demonstrated the remote initiation device.  Since then, CRAWFORD's primary activities related to his scheme have been to prepare for and schedule his first access to the industrial x-ray systems he has tasked the two branches to get for him (which they have told him they now have and will soon present to him).  Once he has them, he agreed with a plan to confirm that the x-ray systems are working (completing whatever final assembly is required), and then to connect his remote initiation device to

5

the control panel of the industrial x-ray system, thus rendering it remotely operable.

## DETAILS OF THE INVESTIGATION

### CRAWFORD's Initial, Independent Attempts to Solicit A Sponsor To Fund His Scheme

15.) On April 17, 2012, the City of Albany (New York) Police Department provided the FBI's Albany, New York Field Office with an Albany Crime Analysis Center (ACAC) posting that referenced GLENDON SCOTT CRAWFORD. According to the posting, on April 11, 2012, CRAWFORD walked into a Capital District synagogue asking for assistance. Specifically, while in the synagogue, CRAWFORD asked to speak with a person who might be willing to help him with a type of technology that could be used by Israel to defeat its enemies, specifically, by killing Israel's enemies while they slept. CRAWFORD was denied assistance, and he departed the synagogue. On the same day, CRAWFORD telephoned another Jewish organization, which has a facility in Albany New York, using his AT&T Mobility cellular telephone bearing telephone number (518) 421-xxxx (hereinafter the "Crawford Telephone").

16.) During the telephone conversation with the Jewish organization, CRAWFORD spoke with a representative and made a similar offer and request for financial support regarding his technology. CRAWFORD also identified himself as an industrial engineer with three children. On April 20, 2012, Special Agents with the FBI interviewed the representative of the organization who spoke with CRAWFORD. The representative told agents that he spoke on the telephone with a man, believed to be CRAWFORD, for approximately ten minutes. During the conversation CRAWFORD said that he had "off the shelf" technology that would be important in defeating Israel's enemies. According to CRAWFORD, the technology was approximately 100 years old, but could deal with Israel's enemies by making them die in their sleep. CRAWFORD further stated that the technology could be purchased for a significant amount of money.

**Commencement of the Investigation**

17.) In response to the reports from the synagogue and the Jewish organization, members of the Albany Joint Terrorism Task Force (JTTF) conducted physical surveillance of CRAWFORD. Through surveillance and other investigative efforts, investigators determined that CRAWFORD is a middle aged caucasian male who resides at 171 Hinds Road in Galway, New York, works at General Electric's plant in Schenectady, New York as an industrial mechanic, and uses / owns a variety of vehicles including a purple 1995 Saturn bearing New York State license plate GBS-1006; a red 1992 Chevrolet Camaro bearing New York State license plate EXL-3062; a red 1995 Chevrolet 2500 pick-up truck bearing New York State license plate FJR-1682; and a 2002 Harley Davidson motorcycle bearing New York State license plate 34GG57.

18.) Shortly after receiving the information from the synagogue and the Jewish organization, the FBI introduced into the investigation a Confidential Human Source (CHS) and an FBI Undercover Employee (UCE #1). While consensually monitoring CRAWFORD's meetings and communications with the CHS and UCE #1 since late May 2012, agents have heard CRAWFORD state that he harbors animosity towards individuals and groups that he perceives as hostile to the interests of the United States - individuals he refers to as "medical waste." CRAWFORD has specifically identified Muslims as belonging to this group. CRAWFORD has stated in consensually monitored conversations that he has been a member of the Ku Klux Klan, specifically, the United Northern & Southern Knights of the Ku Klux Klan.

19.) On May 29, 2012, the CHS telephoned CRAWFORD on the Crawford Telephone. A short conversation was conducted and CRAWFORD agreed to meet the CHS at a restaurant in Scotia, New York on May 30, 2012. On May 30, 2012, the CHS, for the first time, met in person with CRAWFORD at the restaurant. CRAWFORD drove to this meeting in his Saturn vehicle. During this meeting, CRAWFORD described his plans for acquiring and arranging to deploy a radiation emitting device that could be placed in the back of a van to covertly emit ionizing radiation strong enough to bring about radiation sickness or death against CRAWFORD's enemies. CRAWFORD talked about his enemies, in

7

particular, Muslims. CRAWFORD said that "radiation poisoning is a beautiful thing," and explained how his device would have the ability to kill silently and without an immediately identifiable source, in part because the human body cannot immediately detect ionizing radiation as it is being administered.  According to CRAWFORD, the device would require three core components:  an x-ray tube or system that would emit ionizing radiation; a power supply for the x-ray tube/system; and a control panel that could be used to remotely turn the device on and off (a remote initiating device).

## Introduction of the CHS in the First Branch of the Investigation

### a. CRAWFORD Describes His Scheme

20.) During the May 30, 2012 meeting, CRAWFORD gave to the CHS the following items/documents: a webpage printout of specifications for a particular model high energy accelerator (a powerful radiation emitting device typically used in non-destructive industrial testing); a computer webpage printout from Wikipedia concerning Acute Radiation Sickness (ARS) and the typical symptoms in humans exposed to varying doses of radiation; a two page hand-written rough sketch which appeared to show a radiation emitting device; and a business card for the United Northern & Southern Knights of the Ku Klux Klan (the organization of which CRAWFORD is a member). CRAWFORD stated that he was a member of this organization.

21.) During this same meeting, CRAWFORD told the CHS that eight (8) to ten (10) Grays (a "Gray" is a unit of radiation dose measurement) of whole body dose ionizing radiation could kill someone in a week or two.  CRAWFORD advised the CHS that all of the parts for a device that could emit such dosage levels are commercially available, and that it would take CRAWFORD a few weeks to construct the device if he had all of the parts. CRAWFORD further advised the CHS that he would already have constructed the device if he had sufficient resources, however, CRAWFORD noted that he currently was "making arrangements" to build the device.

22.) A U.S. Department of Energy, Oak Ridge Institute for Science and Education (ORISE), Radiation Emergency Assistance Center/Training Site (REAC/TS) manual entitled "The Medical Aspects of Radiation Incidents" describes the dangers of radiation poisoning. Page 17 of the manual explains that 50% of a population exposed to ionizing radiation will die within 60 days of absorbing a dose of 6-7 Grays; that a dose of 8-10 Grays would require stem cell transplants; and that doses of 11 Grays and above can result in multiple organ failures and probable death.

### b. CRAWFORD's Research On, and Selection of, the Industrial X-ray System Model For The First Branch

23.) On June 5, 2012, the CHS, for the second time, met with CRAWFORD at the Restaurant in Scotia, New York.   CRAWFORD arrived to this meeting driving his Chevy pick up truck. CRAWFORD stated that he was tired of getting "raped," that there are people out there who have decided that they don't get their fair share in life, and that he (CRAWFORD) wanted to stop these people. CRAWFORD told the CHS that the radiation emitting device that he desired to either construct or purchase was a top of the line, powerful industrial x-ray machine - one used in industry. CRAWFORD stated that once they (presumably he and the CHS) had the X-ray tube/system portion of the industrial X-ray system, he (CRAWFORD) could wire up the power system to run the X-ray tube/system.

24.) CRAWFORD also told the CHS that he was attempting to find part-time employment in a metal shop, not for the money, but for access to x-ray tubes.   CRAWFORD then described the possibility of fabricating a "couple thousand watt" power supply for the device, consisting of wire which would be connected to numerous batteries.   CRAWFORD also told the CHS that he knew a computer programmer who, for $1,000, could write encrypted software that would allow the radiation emitting device to be remotely activated and de-activated.   CRAWFORD also told the CHS that the target of his radiation emitting device would be the Muslim community. CRAWFORD described the device's capabilities as "Hiroshima on a light switch" and that "everything with respiration would be dead by the morning."   CRAWFORD ended this

9

meeting by saying "how much sweeter could there be than a big stack of smelly bodies?"

25.) During the meeting between CRAWFORD and the CHS on June 5, 2012, CRAWFORD gave the CHS CRAWFORD's e-mail address (hereinafter the "Crawford Email Account"). CRAWFORD advised the CHS to type "mutual concerns" in the subject line when e-mailing CRAWFORD so that CRAWFORD could easily identify the CHS's emails.

26.) Investigators have acquired subscriber information and IP logon history for Crawford Email Account from United Online (the owner of NetZero). Investigators have confirmed that the Crawford Email Account is subscribed to by GLENDON S. CRAWFORD, and that the account has been open since April 3, 2000.

**The CHS Introduces UCE #1 in the First Branch of the Investigation and CRAWFORD Continues To Execute His Scheme, Exhibiting Devotion To Its Success (Including Making Plans for its Continuation in the Event of His Death)**

27.) On June 21, 2012, the CHS again met with CRAWFORD. During this meeting, the CHS successfully introduced FBI UCE #1 to CRAWFORD. The CHS told CRAWFORD that UCE #1 was willing to provide funding and/or materials to CRAWFORD in support of CRAWFORD's efforts to construct a radiation emitting device. During this meeting, CRAWFORD advised UCE #1 that the most critical piece in building a radiation emitting device is the X-ray tube/system. CRAWFORD referred to his target populations as "medical waste," which your Affiant believes are code words for individuals whom CRAWFORD would like to harm or kill with radiation poisoning. CRAWFORD, on numerous occasions in meetings with the CHS and/or UCE #1, mentioned establishing a Medical Waste Disposal company as a front for his efforts to purchase, obtain, or otherwise acquire ionizing radiation equipment or components.

28.) During various meetings with the CHS and/or UCE #1, CRAWFORD described how he was taking steps to acquire and/or purchase a false identification document(s) in the name of "Dmitri." According to CRAWFORD, any items purchased or acquired in connection with his radiation emitting device would

be made by "Dmitri," which would impair anyone attempting to trace the real person making the acquisition.

29.) On or about June 25, 2012, in response to CRAWFORD's demonstrated desire to construct and / or acquire a radiation emitting device, the CHS, at the direction of the FBI, e-mailed CRAWFORD at the Crawford Email Account photographs of two different x-ray tubes/systems. Also, on June 25, 2012, UCE #1 spoke with CRAWFORD on the Crawford Telephone. This conversation took place in response to the above e-mail and x-ray tube/system pictures sent by the CHS to CRAWFORD. CRAWFORD responded that "those tubes wouldn't go much further than a couple dozen feet, and wouldn't process the volume of work we need to do." Later in that conversation, CRAWFORD said "we are going to be doing sterilization, they are doing optics." Your Affiant believes these statements refer to the perceived limited distance that the ionizing radiation would travel, and that such distance would prevent sufficient exposure to the ionizing radiation to cause harm to victims.

30.) On June 29, 2012, UCE #1, CHS and CRAWFORD met again. CRAWFORD drove to this meeting in his Saturn vehicle. UCE #1 presented CRAWFORD with three (3) different X-ray tubes/systems so that he could evaluate them. CRAWFORD examined the tubes/systems and asked the UCE for additional specification data regarding the largest of the three x-ray tubes/systems. CRAWFORD said that he needed specification data in order to better assess what it would take to employ the tube/system, as well as in determining the x-ray tube's/system's capacity for producing ionizing radiation. UCE #1 told CRAWFORD that he would attempt to secure specification data.

31.) On July 2, 2012, the CHS again met with CRAWFORD. CRAWFORD drove to this meeting in his Saturn vehicle. During this meeting, CRAWFORD told the CHS to send specification data concerning the x-ray tube/system to a named person.[1]

32.) On or about July 10, 2012, UCE #1 e-mailed technical specification data regarding the x-ray tube/system to the CHS, who then forwarded that information to the Crawford Email

---

[1] The individual's full name and address were provided by CRAWFORD to the CHS, however, they have been redacted for this Affidavit, but are available upon the Court's request.

Account.  The specification data e-mailed by UCE #1 was slightly altered to reflect an increase in the tube's/system's output capacity.

33.)  On July 12, 2012, UCE #1 received numerous text messages from the Crawford Telephone.  These text messages were in response to the technical specification data mailed by UCE #1 to CRAWFORD.  Portions of the July 12, 2012 text messages from CRAWFORD to the UCE are as follows:  "Im gona try t find out more, if the cycle time is a product of precision as opposed to durability upping the duty cycle may be an option with additional cooling or s6ething.  Could put us in the neighborhood Yet.  I have folks I may be able to consult. …..may be able to play games w th duty cycle to get to a workable range. May work. OR may blow th part n kill us both, Bwahahahaaaa." Your Affiant believes these text messages refer to CRAWFORD'S thought that he may be able to change the functioning of one of the three x-ray tubes/systems to produce more ionizing radiation for a longer time and/or on a more frequent basis.

34.)  On July 16, 2012, at approximately 10:04 a.m., CRAWFORD, using the Crawford Telephone, sent a text message to UCE #1 that read: "Is the whole machine available? One friend told me depending on th structure of th timer circuit, that may ba an option, and he may be able to conjur up something. whether the business end can take it remains to be seen, still waiting t hear back from another friend on that……..then the power supply will be right, n if my friend can get engineering support, may work out nice. Whatever th nature of the trigger circuit, if tuning can put us in th neighborhood we be further ahead."

35.)  On July 20, 2012, CRAWFORD met with the CHS and UCE #1.  CRAWFORD drove to this meeting on his Harley Davidson motorcycle.  CRAWFORD stated how he had been pursuing bits and pieces of his plan for "quite some time" but that he started actively pursuing the matter within the last year.  CRAWFORD also told the CHS and UCE #1 that they collectively could build the device on CRAWFORD's property.  CRAWFORD went on to say that they should build the device in his "shop" (an apparent reference to the garage or shed located on CRAWFORD's property

at his residence. CRAWFORD also discussed with the CHS and UCE #1 potentially modifying the output of the largest of the three x-ray tubes/systems previously shown to CRAWFORD.

36.) On July 24, 2012, UCE #1 provided additional technical specification data for the largest of the three x-ray tubes to to CRAWFORD at the Crawford Email Account. In that email, UCE #1 advised that the x-ray tube/system was engineered and designed to produce two to three pulses of ionizing radiation per minute. On July 24, 2012, CRAWFORD inquired "would he [UCE #1's associate] know if we could do [more] pulses a minute? Again, if it's a resolution issue, we may be able to. If it's a thermal or harmonic issue, we may need to keep herds of tubes in stock…." Your Affiant believes this inquiry by CRAWFORD demonstrated his intent to modify the functioning of the x-ray tube/system to produce more pulses of ionizing radiation per minute. Such a change would ultimately increase the amount of ionizing radiation absorbed by anyone in the x-ray tube's/system's range, rendering the device more lethal.

37.) On or about July 30, 2012, CRAWFORD underwent a surgical procedure at Saratoga Hospital. CRAWFORD appeared to be concerned that he would not survive the surgery, and, as a result, at 2:14 p.m. on July 27, 2012, sent, via the Crawford Telephone, a text message to the UCE #1 that read: "Goin under the knife Monday at 9:00, all should be fine, but if something goes wrong, you can reach my wife at 518-224-xxxx. Ask for my computer and my phone, most of the data you need to proceed will be in there, and the software guy is in my phone, his name is Eric from [name of FEIGHT's business]. He is still down south. Tell him you need to operate plc outputs over wifi or a smart phone. You need 2 video feeds, a half dozen ons and offs. I will contact you asap after." Upon information and belief, the "Eric" referenced in CRAWFORD's text message above is ERIC J. FEIGHT.

38.) In addition to the text message described above, CRAWFORD, apparently still concerned about his surgery, sent, on the evening of July 27, 2012 at 6:55 p.m., e-mails, via the Crawford Email Account, to UCE #1 that contained names of numerous individuals whom UCE #1 could contact in an effort to keep CRAWFORD'S plans moving forward toward completion in the

event his surgery went awry. These emails read in pertinent part as follows:

Sent Fri, July 27, 2012 at 6:55 PM:

"Further, once you have my computer and phone, get ahold of ------------, of the loyal white knights, 1-336-xxx-xxxx.[2] To make certain this happens, I will have a friend names ---- working my end to reach you and get this stuff to you.[3] The knights may have the resources to invest and bring the project to fulfillment. That is, if you wish to continue. If not, let me know and I will make arrangements for others to shoulder your load in this."

Sent Fri, July 27, 2012 at 7:04 PM:

"Feel free to reach me by phone or email, your efforts make you the most qualified to continue. If you can't get comfortable with it, I have others who can. But please make haste in letting me know. Just in case."

Sent Fri, July 27, 2012 at 10:27 PM;

"There is also a fellow named ------------,[4] electronics gizmo dude extraordinaire, he was willing to lengthen the pulse time or increase the number of pulses. Processing medical waste intrigued him. His contact info is in my phone. 100 rems equals ONE grey. All applications start at one meter and attenuate according to the inverse squared law. You can look it up., and attenuation and dissipation are NOT the same thing, but it wont matter till the numbers are higher. Everything you need to continue without me and present to the loyal white knights are in my phone and computer. Im sure everything will be fine, but if something happens I don't want this to go away, it can serve our people well."

---

[2] CRAWFORD included the first and last name of an individual and the individual's telephone number, however the names and number have been redacted for purposes of this Affidavit. The names and number are available upon the Court's request.

[3] CRAWFORD included the first name of an individual, however the name has been redacted for purposes of this Affidavit. The name is available upon the Court's request.

[4] CRAWFORD included the first and last name of an individual, however the names have been redacted for purposes of this Affidavit. The name is available upon the Court's request.

39.) On July 28, 2012 at 2:26 p.m., CRAWFORD, using the Crawford Telephone, sent a text message to UCE #1 that read: "Still tryin t corner my engineer friend. Your route may be the fruitful one. I have made provisions to get you my phone and computer if something happens so you can build on what I started."

40.) CRAWFORD survived the surgery, apparently without complication. On August 14, 2012, CRAWFORD sent numerous text messages from the Crawford Telephone to UCE #1 and wrote in pertinent part:

...I haven't nailed down the software guru yet, good things take time. Hes the man f the job, I met dozens n he's who I need. When I meet my friends down south I dunno whats gona havta happen, we may need t work closer or we may need t compartmentalize. If I need t proceed alone I will supply you with all the info you need t duplicate my process    n    start your own chapter…Southern boys are a fickle bunch. I will supply you with parts,    processes n procedures, and rest assured I will give the most cost efficient route. I will    even give free labor when it gets t that point. Dont feel abandoned, we will consolidate    our operations as soon as its practicle.    If my software guy can modify the present    prospect, we will need t visit you. Is that possible?

**Crawford's Interstate Travel to Meet the CW and Solicit Further Support for His Scheme**

41.) In recorded conversations between CRAWFORD and the CHS and/or UCE #1, your affiant has heard CRAWFORD state both that he is a current member of the United Northern and Southern Knights of the Ku Klux Klan, and that he is a former member of said group. A CW, who is involved in the second branch of the investigation, is a high ranking member of the Ku Klux Klan ("KKK"). On August 23, 2012, CRAWFORD met with the CW in a small town in North Carolina and described the radiation emitting device he wanted to acquire. During the conversation, CRAWFORD solicited financial support for acquiring the device, and requested that the CW meet with other KKK groups and

officials to solicit them to provide financial assistance to build his device.

42.) After the meeting between CRAWFORD and the CW on August 23, 2012, CRAWFORD, using the Crawford Email Account, sent and received emails to/from the CW between the dates of August 28, 2012 and September 30, 2012. During this period, CRAWFORD set up a time with the CW for him (CRAWFORD) to come to North Carolina to meet in person with the CW and individuals who he believed might be interested in funding the construction and/or acquisition of the above-referenced radiation emitting device.

43.) In a SMS text message to UCE #1, on or about September 25, 2012, CRAWFORD wrote, "My buddy the electronic tinkerer expressed a willingness to help You out with the pulse timing issue. His number is 518-728-xxxx give him a call, he's expecting you. If you or he need any help im here for you Both." I believe that CRAWFORD's reference to "my buddy the electronic tinkerer" is a reference to person A as the number provided by CRAWFORD to UCE #1 is subscribed to by person A.

**The CW Introduces UCE #2 and UCE #3 in the Second Branch of the Investigation, CRAWFORD Again Describes His Scheme, and Solicits Support To Advance It**

44.) On October 4, 2012, CRAWFORD met, for the first time, with two FBI UCEs (UCE #2 and UCE #3), and the CW in Greensboro, North Carolina. UCE #2 and UCE #3 posed as KKK affiliates and part of a commercial mining operation that had significant financial resources. CRAWFORD discussed with them the capabilities, assembly, and the acquisition of components he (CRAWFORD) deemed essential to create a functioning, lethal, and deployable radiation emitting device. During this meeting, CRAWFORD informed UCE #2 and UCE #3 that he had a "software guy" who could facilitate the fabrication of a control panel to function (turn on and turn off) the radiation emitting device from a distance. CRAWFORD indicated that his software guy was like-minded and that he and CRAWFORD would use the words "used equipment" in the title/subject line of emails when discussing

the construction of and/or acquisition of components for the radiation emitting device.[5]

45.) In the meeting with UCE #2 and UCE #3 (and the CW) on October 4, 2012, CRAWFORD stated he had discussed the construction and/or acquisition of components for his radiation emitting device with an individual from Tennessee. CRAWFORD has also stated that he believed this individual from Tennessee is attempting to obtain funding for CRAWFORD's device. The individual from Tennessee is believed to be person B who, investigators believe,[6] met in person with CRAWFORD on August 24, 2012 in Tennessee. CRAWFORD informed the CW during their face to face meeting on August 24, 2012, that he (CRAWFORD) was going to meet with person B to discuss CRAWFORD's radiation emitting device. CRAWFORD later informed UCE #1 that he had met with people down south and that he was well received. In reviewing emails obtained from the initial search warrant on the Crawford Email Account (executed on August 24, 2012), referenced above, an email message was identified as being sent from CRAWFORD to person B on August 24, 2012 and the title/subject line of that e-mail was "mutual concerns."

46.) On October 6, 2012, CRAWFORD sent an email message to the CW describing how he proposed he would meet with UCE #2 and UCE #3 in upstate New York. CRAWFORD suggested that they meet at a specified location near Albany. CRAWFORD also suggested in that email message that they "bring cash for toys, 6 bills should do." I believe that CRAWFORD, in using the word "toys", is referring to materials/components of the control panel to remotely control a radiation emitting device.

47.) Between November 2 and November 15, 2012, UCE #1 sent and received multiple e-mails to and from the Crawford Email Account. In an e-mail dated November 2, 2012, UCE #1 wrote:

---

[5] From a judicially-authorized search of the Crawford Email Account on August 24, 2012, pursuant to Title III, it was learned that, on August 7, 2012, CRAWFORD sent an email message to Feight's email address. In a text message sent by CRAWFORD to UCE #1 on July 27, 2012, CRAWFORD stated, in part, "…and the software guy is in my phone, his name is Eric from [company name]". In more recent email communications to UCE #2, CRAWFORD stated that he continues to work with and communicate with his software guy, who has been identified as FEIGHT, on his proposal.

[6] Crawford confirmed his intention to do this in a conversation with the CW on August 24, 2012.

"Heard things are going well with our business down
south….glad to hear that…. would still like your help with
a missing piece for our business…. we have a [reference to
technical specifications]. Can you help point us in the
right direction of a power supply we can buy for it???????
Let me know what you think…. thanks man"

After a few e-mails back and forth, CRAWFORD wrote back on
November 9, 2012 and said:

"Ok buddy, Im gonna give me best guess and say Id go with
the [reference to technical specifications]….I will be more
in touch soon as I am able. Till then BE FUCKING CAREFUL.
Heres to new industries for the new America…"


**CRAWFORD's Recruiting of FEIGHT and the Introduction of FEIGHT
into the Second Branch of the Investigation**

48.) On November 14, 2012, CRAWFORD met with UCE #2, UCE
#3, and FEIGHT at a coffee shop near Albany, New York. CRAWFORD
previously had met with FEIGHT and discussed the scheme with
him. CRAWFORD arrived at the meeting in his Saturn vehicle.
During that meeting, FEIGHT and CRAWFORD both stated they were
"in" (meaning committed to the acquisition and construction of
the radiation emitting device) and named their group "the
Guild."

49.) Early in the meeting, FEIGHT confirmed that he had
known CRAWFORD for between five and ten years, and was then
asked by one of the UCEs, "What do you know about us?" FEIGHT
responded:

> Feight: Not a lot. I, I know what, what
> Scott's told me. Um, you know,
> originally we were just talking
> about, uh, some entrepreneurs had
> an idea for a sterilizer, for a
> sterilizing medical waste and that
> was cool. They talked to me about
> doing controls on some  of it and
> I was like, well, you know, some
> of these things I don't  know

anything about.  What do the
controls need to do, and yeah, I
can do that, and, ah, you know,
then as our discussions about the
disgust with how things are going,
he opened up a little bit more
about, you know, what the, uh,
medical waste was, so, uh, and I
know just the, you know, the kind
of general theory about, you know,
this is, uh, gonna be mobile.
It's gonna be parked some place.
It's gonna have uh-uhuh target,
that the target's not gonna know
about it  until sometime later.

UCE #3:     Yeap.

Feight:     Which, ah, [UI]

UCE #2:     When [UI] too late.

FEIGHT:     Yeah, ah

CRAWFORD: They'll never know.

FEIGHT:     Which is, ah, you know, I thought
was like incredibly smart because,
you know, that, that gives you,
ah, a lot more isolation from the,
the issue.

UCE #2:     Absolutely.

FEIGHT:     Ah

UCE #2:     If you don't know what hit you,
you can't ah

FEIGHT:     Yeah. Eh....

                    *    *    *

FEIGHT went on to say:

FEIGHT:      Yeah, yeah. So, I mean I, I, I
             have to admit having never been
             involved in anything like this
             before, you know, at first it made
             me a little bit nervous  and, I'm
             like, okay, well, you know, as
             long as I still have some, you
             know, real good separation,
             plausible deniability, you know, I
             didn't know I was doing

UCE #3:      Yeah

Feight:      con, I been doing controls for
             twenty-five years.

UCE #3:      Right.

FEIGHT:      I was doing controls on another
             machine.

UCE #3:      Right.

FEIGHT:      Uhm, you know, my, uh, uh, eh, and
             I don't want to say apprehension,
             but nervousness about how
             much involvement I was gonna get
             in this kind of got outweighed,
             uh, quickly with, you know, when I
             started seeing how things, the
             direction things were going and
             then certainly after the
             elections. It's like well, okay,
             you know, that old saying is
             right.  You know, the only thing
             necessary for evil to triumph is
             for good men to do nothing.

UCE #3:      Do nothing.

FEIGHT:      And…

```
FEIGHT:    I've done nothing for a lot of
           years, but just shoot my mouth
           off and I…

FEIGHT:    see how effective that's been…

FEIGHT:    So, Uhm, although I would still
           like to maintain as much  plausible
           deniability as I can, ah, like you
           say, you know, [in] for a penny
           [in] for a pound so, ah…
```

     50.)  During the meeting, UCE #2 and UCE #3 showed CRAWFORD
and FEIGHT pictures of an industrial x-ray machine they claimed
to have access to, which had the potential of emitting ionizing
radiation at a level that lethal to humans.  Upon reviewing the
pictures, FEIGHT stated that he could fabricate a remote
initiation device for this machine:

```
FEIGHT:    Yeah. The, the, the quick and easy
           answer is yes, I do remote
           telemetry all the time for
           controls.  I can give you all the,
           you know, if you want to read you
           dosage levels, your power
           consumption, you know, any,
           that's easily doable
           and I do it all the time. The,
           the trick is, the doing
           it covertly and, and that's where
           I got, you know, I  read, every
           time I thought of  a way to do
           it, I also thought of a way that
           you could get tripped up doing it
           that way. Um,

FEIGHT:    but line of sight, if, if we're,
           but [UI] I was thinking  from
           miles away.  If you're talking a
           couple blocks away, where you
           could do line of sight,  spread
```

                    spectrum, that's, that's a
                    lot easier. That, that's a heck
                    of a lot easier.


    51.) UCE #3 gave FEIGHT $1,000 to purchase materials needed
for construction of the initiation device. FEIGHT in turn gave
the money to CRAWFORD, who had represented that he would
purchase the components.  All parties agreed to meet in the
beginning of December 2012 in order to allow FEIGHT and CRAWFORD
time to build the remote initiation system, and then demonstrate
the successful operation of that initiation device on some
routine home appliance.  At the end of the meeting, FEIGHT gave
UCE #2 and UCE #3 his e-mail address and telephone number so
they could contact him.

    52.) CRAWFORD and FEIGHT both have used the phrase
"sterilize medical waste" to refer to the harming and killing of
human beings, and stated that the purpose of their device is to
kill human beings.  From time to time, however, they each have
expressed a reluctance to be the one who actually triggers the
device to kill.  For example, CRAWFORD stated at a meeting with
the CHS and UCE #1 on June 29, 2012:  "Right. Well, I, well I
figured you were going to have the business.  Uhm, I was just
going to be your technical advisor and let you turn him loose
with it."  On July 20, 2012, CRAWFORD stated in a meeting with
the CHS and UCE #1, "…Ah, the only difference is I don't know –
I don't know if I would be capable of doing it…"   At this
November 14, 2012 meeting, referring to the radiation emitting
device, UCE #3 stated, "We don't need you to place and store it.
We'll handle the operational end of it.  And you don't need to
know who's gonna do that for your own protection."   FEIGHT
responded, "I would prefer not to."

    53.) On November 15, 2012, UCE #1 sent an e-mail to the
Crawford Email Account asking CRAWFORD to connect him with his
"software guy," to which CRAWFORD responded by saying, "I cant,
hes out of country.  A timer should do the trick."   However,
FEIGHT met with CRAWFORD, UCE #2 and UCE #3 on the evening of
November 14, 2012 near Albany, New York and did not mention
leaving the country the following day.

**CRAWFORD's Operational Security Concerns, Initial Obstacles and Delays In Building the Remote Initiation Device, and CRAWFORD's Continuing Devotion to the Success of His Scheme**

54.) On November 19, 2012, UCE #2 sent an e-mail message to both FEIGHT and CRAWFORD, at the Crawford Email Account and FEIGHT's e-mail address, respectively. In the message, UCE #2 asked FEIGHT and CRAWFORD if they could meet sometime around December 5-7, 2012. FEIGHT responded via an e-mail message to UCE #2 on November 23, 2012. His response contained a computer-generated drawing of the remote initiation device. Based on FEIGHT's e-mail message on November 23, 2012, UCE #2 sent an e-mail message to FEIGHT on November 25, 2012, again asking if he could meet in a couple of weeks. UCE #2 also sent an e-mail message to CRAWFORD on November 25, 2012 which stated that UCE #2 received an e-mail from FEIGHT and asked CRAWFORD to get in touch with FEIGHT to get the exact specifications for the supplies and to acquire them as discussed previously.

55.) On November 24, 2012, at 10:38 a.m., CRAWFORD sent a text message to UCE #2 using an AT&T Mobility cellular telephone bearing number (518) 242-xxxx (hereinafter "Crawford Telephone #2")[7] and stated "Happy thanksgiving! Been unable to reach yoda. Heard anything?" Your affiant believes this text message shows CRAWFORD asking UCE #2 if he/she has been in contact with co-conspirator FEIGHT, whose codename is "Yoda."

56.) On November 26, 2012, CRAWFORD met with the CHS in the basement of a coffee shop near Albany, NY. CRAWFORD said he believed that someone "had access to his email, and as long as we don't do stuff online, they will be fine." In that meeting, CRAWFORD gave the CHS a hand written note that said "You deceived us. We expect you to return the resources in question, and if you don't our attorney will be in touch. Consider this your last warning!" CRAWFORD asked the CHS to have UCE #1 send an e-mail to CRAWFORD containing the verbiage in the aforementioned note. CRAWFORD indicated that the sending of this e-mail by the UCE #1 would somehow potentially mislead those individuals who were reading his e-mail. It should be noted that CRAWFORD previously relayed similar concerns about

---

[7] CRAWFORD previously had informed UCE #2 and UCE #3 that he had acquired a new phone for communications with them.

unknown person(s) having access to his email, yet he continued
to utilize email to communicate. For example, on June 27, 2012,
CRAWFORD advised the CHS to "not email nothin", yet on July 24,
2012, CRAWFORD utilized the Crawford Email Account to
communicate with UCE #1 regarding the technical specifications
of the x-ray tube(s)/systems. Additionally, on June 5, 2012,
CRAWFORD stated to the CHS that "someone was in his e-mail",
however, CRAWFORD continued to utilize the Crawford Email
Account.

57.) On December 5, 2012, CRAWFORD sent a text message to
UCE #1 using Crawford Telephone #2 and stated "Testing, testing,
1,2,3…Good morning! This is Dmitri. As Ii shared w your friends.
fear not, all is well. As yet I a, unable to get a license, but
I ma closer. Get back a your comfort level allows." I believe
CRAWFORD was trying to obtain a false i.d. using that name.

58.) On December 7, 2012, CRAWFORD sent a text message to
UCE #1 using Crawford Telephone #2 and stated "Perfect ! I
return some tnite, we can have some fun w this."

59.) On December 14, 2013, CRAWFORD sent a text message to
UCE #2 using Crawford Telephone #2 and stated "Ive begun
perusing other options and equipment. I know others who may have
what this job requires. Nowheres near his league but willing t
bring game t the field. Would you like me to scout out a new
recruit? May be quicker, this delay was a shock to me…On your
mark, of course. These fields are very ripe for harvest, Ive
been told to wait for notification. Been awhile. If hes too busy
we have options." Your affiant believes this text is in
reference to CRAWFORD's displeasure with the lack of
responsiveness from FEIGHT, and that CRAWFORD was seeking the
approval of UCE #2 and UCE #3 to identify and recruit other
individuals, with some subject matter expertise, into the
conspiracy.

60.) On December 19, 2012, CRAWFORD sent a text message to
UCE #2 using Crawford Telephone #2 and stated "Could you email
me copies of the energy requirements, energy management module
and output of the unit Thru one of the previously discussed
conduits? May simplify the shopping event." Your affiant
believes this text message shows CRAWFORD asking UCE #2 for a
copy of the relevant technical specifications for the purpose of

identifying, locating and/or acquiring the parts or components appropriate to attach the remote initiation device to the proposed x-ray system in the second branch of the investigation.

61.) On December 24, 2012 CRAWFORD received a text message on the Crawford Telephone, which said, "Out now. At the mall hearing the cackle of haj women. Gross". Approximately one minute later CRAWFORD responded with "Yeah. Theyre gross."

62.) In an SMS text message sent by CRAWFORD to UCE #2, using Crawford Telephone #2, on January 2, 2013 at 11:16 a.m., CRAWFORD wrote: "Brother, sick of waiting. Perhaps we could meet to peruse other options, more like a contractor. I have an asset I could develop, and we can meet to conjure up a new game plan. I expected t be running by now. For the sake of civility lets let our present asset continue as is and lets meet up to develop a plan that involves less hoping n more doing. Whens a good time n day to meet? Theres a Chinese joint in buffalo that may be a good halfway point." Approximately three minutes later at 11:19 a.m., CRAWFORD, using the Crawford Telephone, called person A on his telephone and asked to speak to him in person. Your affiant believes that due to the timing of the aforementioned text messages and telephone call, that person A is the other asset CRAWFORD believed he could develop.

63.) On January 7, 2013, CRAWFORD sent a text message to UCE #1: "Sick n tired of waiting. Im gona buy em myself n experiment til it works. Ive another asset in the works, not world class but willing t bring game t the field. I have a rough idea of what he had in mind, and my tax return will give me some room t tinker with. If ya want what i got so far ill send it, but after the resources you expended you deserve a more certain outcome. Ill get ya more up t speed as i succeed. Im so sorry for the jerkaround, thought my guy would get results. He wont even call or text back, ive promised Him the world. Do you have a pushbutton switch or an on off lever like a lightswitch? Have our very large friend get ahold of me n ill get him up t speed on what I got so far. I expected everything t be off and running by now. I been fired for better results than this. Im so sorry." Your affiant believes this message references CRAWFORD's unwillingness to wait any longer to purchase the parts needed to construct a remote initiation

device for an industrial strength x-ray machine.   CRAWFORD also references a very large friend who I believe is the CHS.

64.) On January 8, 2013 at 8:01 a.m. and 10:49 a.m., CRAWFORD placed outgoing calls to telephone number 518-869-xxxx. Open source checks, as well as a review of the business's website, indicates that telephone number belongs to an identified commercial supply business. It appears to be a business that sells industrial control and automation parts, and other miscellaneous electrical supplies.   That business has locations advertised across New York State, one in Albany NY, the office to which the 518-869-xxxx number is assigned.   Your affiant believes that CRAWFORD called this business on both occasions to inquire into the availability and/or purchase of specific parts and components that are needed for the construction of the remote initiation device.

65.) On that same date, at 10:59 a.m., CRAWFORD, using Crawford Telephone #2, sent a text message to UCE #2 and stated "Is there any way to get a schematic of the control panel? We probably need to visit the builders...."   Your affiant believes that CRAWFORD is attempting to gain the electrical schematics for the x-ray system control panel so that he can obtain and procure the proper parts or components so that the remote initiation device will be compatible with the proposed x-ray system.

**Building the Remote Device With FEIGHT and Others, CRAWFORD's Use of Proxies and Other Tactics To Disguise His Involvement, and CRAWFORD's Interest In Further Developing This Weaponized Technology for Future Uses**

66.) Also on January 8, 2013, CRAWFORD made an outgoing call using the Crawford Telephone to FEIGHT's cell phone.   The call was approximately ten minutes in duration.   During the call, CRAWFORD asked FEIGHT "All we need is a transmitter, an IO card, a couple of 120-volt, and a couple of 30-volt, right? That's all we're looking for right?"   FEIGHT responded by saying "Nothing is going to be 120-volt, everything is going to run off [technical specification].   That way you can use vehicle power both sides."   CRAWFORD then asked FEIGHT if he wanted a couple

of 120-volt in case he needs them to which FEIGHT responded by saying they are not needed because the radios will run off the [technical specification]. CRAWFORD then asked FEIGHT "On the IO card, on the business end of the machine, ok, should we get the ability to switch to 110-volt on the other end? We haven't had a look at the prints yet." FEIGHT told CRAWFORD, "On the machine side, probably would be a good idea to get a set of prints and look at it, but, my basic idea was this. There is probably a switch to turn on and off. What my thoughts are is, umm, you have, ah, a [technical specification], a relay with a 12-volt coil. That gives you the contact closure that you need for, you know, for the button part of it. The other side we were looking for some feedback. There has got to be a light on there that says it is running. Whatever the voltage that light is, you need a relay for that, to umm, to go back into it. I can sketch everything up for you." FEIGHT then told CRAWFORD that he would be all set as he would get some part numbers that would provide cover for their plan. He also asked CRAWFORD to get him the schematics for the device once CRAWFORD came into possession of the schematics. CRAWFORD then asked FEIGHT to put the parts list together and text him the GPS coordinates so that CRAWFORD could go and get the list. FEIGHT then informed CRAWFORD that he had a rough time lately as he got the flu and a stress fracture, and combined with his intense work load, all have made him tough to get ahold of lately. However, FEIGHT said he would be more in touch with CRAWFORD as he would not be traveling as much for work due to the stress fracture in his foot. Your affiant believes this conversation is in reference to the parts needed for the construction of a remote initiation device designed to remotely activate the industrial x-ray machine that the UCEs #2 and #3 claimed to have access to.

67.) The CHS called CRAWFORD on the Crawford Telephone on January 9, 2013. CRAWFORD informed the CHS that "Things are starting to move. Umm and ah, so, ah, with or without. Ah, so, I'll be, I'll be in touch with, ah, with some part numbers, ah, and, ah, knowledge pretty soon. And, ah, we'll go from there. And the, you know, when I get some knowledge, we'll just meet same bat time, same bat channel." Your affiant believes this statement by CRAWFORD to be in reference to the list of parts required to build a remote initiation device for the radiation

27

emitting device being planned in the first branch of the investigation. Your affiant also believes that CRAWFORD intended to give the CHS the aforementioned list once he acquired it. CRAWFORD then asked the CHS, "Do you know if the thing has on off switch or on off buttons?" The CHS told CRAWFORD that he would need to speak with UCE #1 in order to get the answer to that question.

68.) On January 11, 2013, at 10:23 a.m., Crawford received an incoming call from FEIGHT via the Crawford Telephone. CRAWFORD asked FEIGHT "The list is ready?" FEIGHT responded, "yes." CRAWFORD asked, "do you want me to come to you?" FEIGHT asked if they "could meet somewhere…." CRAWFORD replied "that would be perfect. What time do you want me and where do you want me to be?" FEIGHT said, "normally I would meet you at the plant, I would just swing by the plant but my badge is expired." CRAWFORD responded "I'll come out to the parking lot right there...just pull in to the (UI) parking lot and call me and I'll be right out." Your affiant believes that the "list" that is discussed is the parts list that FEIGHT was developing for the remote initiation device and that the plant referred to by FEIGHT is the GE facility in Schenectady where CRAWFORD works. FEIGHT possesses an expired badge from GE due to his former role as a contractor at the facility.

69.) On January 11, 2013, at 10:30 a.m., CRAWFORD made an outgoing call, utilizing the Crawford Telephone, to 518-376-xxxx – a number utilized by person C – a person with whom CRAWFORD works at GE. CRAWFORD inquired about person C's location within the GE plant and said, "I will be right there." At 10:31 a.m., and again at 10:33 a.m., CRAWFORD made an outgoing call, using the Crawford Telephone, to FEIGHT. CRAWFORD told FEIGHT, "when you call me, I'm going to send [person C] out. [Person C's] just gonna grab the information." Later in the conversation, CRAWFORD stated "So don't be surprised when you call and when you get here, [person C's] going to come out and [person C]'ll take the information. Just hand everything right over to [person C]…" At 10:51 a.m., person C called the Crawford Telephone and inquired into CRAWFORD's location within the plant, and advised that he/she would meet him at that location. Your affiant believes that CRAWFORD utilized the Crawford Telephone to

recruit person C to act as a proxy in his efforts to covertly obtain the parts list for the remote initiation system.

70.) On January 11, 2013 at 12:56 p.m. and again at 1:25 p.m., CRAWFORD, using the Crawford Telephone, called the CHS. While CRAWFORD did not actually speak with the CHS, CRAWFORD can be overheard talking out loud (during both call attempts) and saying "hey buddy, I got the list." At 1:35 p.m., CRAWFORD received an incoming call from the CHS to the Crawford Telephone. During the call, CRAWFORD advised the CHS that "I got the list. You want to meet later?" After they established a time and location to meet in person that afternoon, CRAWFORD stated "I'll give you the list of parts and a run down…."

71.) On January 11, 2013, at 2:06 p.m., using Crawford Telephone #2, CRAWFORD sent a text message to UCE #2 which stated "Got the list, moving to implement." At 2:14 p.m., CRAWFORD sent a second text message, using Crawford Telephone #2, and advised "Made arrangements, road is clear. Heading for success! To the guild!"

72.) Investigators surveilled CRAWFORD later that day, and at approximately 3:15 p.m. CRAWFORD met with the CHS. CRAWFORD drove to the meeting in his Saturn vehicle. CRAWFORD provided a copy of the parts list to the CHS. CRAWFORD also provided guidance to the CHS as to where, and how, to covertly procure the parts necessary for the remote initiation device in the first branch of the investigation.

73.) At 6:34 p.m. on January 11, 2013, CRAWFORD received, via the Crawford Telephone, a text message from UCE #1: "Talked to the big man  he said u gave him the list and it looks good thanks Ill be in touch." At 6:34 p.m., CRAWFORD texted: "Soon as I can share you will be pleased".

74.) At 7:09 p.m., CRAWFORD, using the Crawford Telephone, answered an incoming phone call from UCE #2. UCE #2 called CRAWFORD in response to CRAWFORD's text message sent earlier that day at 2:06 p.m. and 2:14 p.m. as described above. UCE #2 stated, "Sounds like we are moving forward and back on schedule?" CRAWFORD responded "I'll let you know when I get the stuff." UCE #2 also stated "When you guys get a timeframe for me and my friend to come back up there and see what you got and

we are doing, just give me a call and give me some notice as soon as you know something." CRAWFORD responded, "OK, soon as we can."

75.) On January 12, 2013, at 10:29 a.m., FEIGHT called CRAWFORD on the Crawford Telephone. They did not speak but at 10:31 a.m., CRAWFORD, using the Crawford Telephone, returned FEIGHT's call. FEIGHT stated "I just wanted to touch base real quick and, number one, make sure you got the stuff I gave to [person C]?" CRAWFORD responded "yup, I did." FEIGHT stated "and see if it made sense to you and that's what you needed?" CRAWFORD responded "Yup. Im sure its gonna do just fine and I've already started to act on it." FEIGHT stated "Oh, ok. Let me know when you get the pieces and parts to put together........I enhanced a little bit so that you get indications, both ends, that you got signal and you get indication on the deployment side that the remote has told it to turn on as well as getting verification on the remote side that it came on....." CRAWFORD replied "nope, beautiful. I'm sure it's going to be beautiful." FEIGHT then stated "Once you get the radio in your hand it will be easy to figure out what kind of box you want to mount it to.....let me know if you need anything, let me know when you get the pieces and parts and we'll start playing with the toys." CRAWFORD replied "OK bud, I will be in touch."

76.) On January 21, 2013, at 7:27 a.m., CRAWFORD sent a text message to FEIGHT using Crawford Telephone #2. The content of the text message read "Meetup for rangoons on 28th bout 330 if you can make it see ya there. If not ill catch you up later. All coming." Your affiant believes this text message was sent by CRAWFORD to invite FEIGHT to a meeting scheduled for January 28, 2013 between UCE #2, UCE #3 and CRAWFORD.

77.) On January 25, 2013, at 3:56 p.m., CRAWFORD called telephone number 800-363-xxxx using the Crawford Telephone. An open source query of the aforementioned telephone number shows that the number belongs to a commercial supply company. During this telephone call, CRAWFORD stated "a friend of mine is going into a business where he may have an application...ah...for a very large battery...ah...so he was thinking of going with a generator but...ah, you know...a battery would be nicer." I believe that CRAWFORD contacted this company to determine if the

company had batteries that could power CRAWFORD's radiation emitting device rather than using a generator.

78.) On January 28, 2013, CRAWFORD met with UCE #2 and UCE #3 at a restaurant near Albany, New York. During the meeting, CRAWFORD informed the UCE #2 and UCE #3 that the parts for the remote initiation device had been ordered and that he (CRAWFORD) expected the parts to be in his hands within a week or two. CRAWFORD described how he sanitized the purchase of these parts by saying "the very things that Yoda ordered...ah...he wrote them down. I had another guy get them. Hes gonna get them, drop them off at the pawn shop, then I am going to pick them up." (Yoda is the code name for FEIGHT). Later on in the conversation, CRAWFORD identified the owner of the coffee shop as the individual who purchased the parts for CRAWFORD. CRAWFORD also informed UCE #2 and UCE #3 that a co-worker had a vague idea of what was going on with regards to the radiation emitting device. CRAWFORD's co-worker was assisting CRAWFORD by acting as a proxy and making telephone calls for him. Also during this meeting, CRAWFORD identified potential targets of his radiation emitting device, which included a Muslim organization, a political figure, and a political party. Due to the identification of these targets, UCE #2 and UCE #3 advised CRAWFORD that he would have first choice of the targets once the radiation emitting device was completed. Towards the end of their conversation CRAWFORD stated "I am in this for my kids. I don't want money... You know what, after this last election, the electoral process is dead... So now, all that is left is to make the mother fuckers pay..."

79.) On February 1, 2013 FEIGHT and CRAWFORD met at the restaurant near Albany, New York. During the meeting, FEIGHT acknowledged that he was still "in" and dedicated to the cause. CRAWFORD informed FEIGHT that he had ordered the parts and the parts were expected to arrive within a week or two. FEIGHT explained to CRAWFORD that once CRAWFORD had all the parts to bring them to him and give him a week to put the whole thing together. CRAWFORD agreed with FEIGHT's course of action.

80.) At approximately 4:07 p.m., on February 1, 2013, using the Crawford Telephone, CRAWFORD called telephone number 518-869-xxxx – the number belonging to [a commercial supply store]. During the thirteen-plus minute conversation, CRAWFORD stated "I gotta order a [reference to technical specifications and equipment for the remote initiation device]. Would that be possible?" To which the employee responded, "Yeah, and what is the company's name?" CRAWFORD responded with "Ah... [name of the coffee shop]." CRAWFORD then gave the address for the coffee shop. CRAWFORD also identified that he wanted to order a [reference to technical specifications and equipment for the remote initiation device]. However, the employee required part numbers to process CRAWFORD's order. CRAWFORD asked the employee for [the manufacturer's] telephone number so that he could call them and get part numbers and/or place the order for the aforementioned items directly from [the manufacturer].

81.) That same evening, at approximately 5:33 p.m., CRAWFORD, using the Crawford Telephone, called FEIGHT. During the call, CRAWFORD asked FEIGHT, "Hey for an action open relay, how about an old square D motor starter?" FEIGHT responded by saying "No, thats way too big. You want something like a little [reference to particular electronic component]." Subsequently, CRAWFORD said "So, get a [reference to particular electronic component] and a base? To which FEIGHT responded, "Yeah." Your affiant believes this conversation is regarding one of the parts previously identified by FEIGHT as necessary to build the remote initiation device for the radiation emitting device.

82.) On February 4, 2013, between 1:02 p.m. and 1:05 p.m., using the Crawford Telephone, CRAWFORD sent and received multiple text messages from telephone number 518-728-xxxx – a telephone number subscribed to by person A:

CRAWFORD: "Hey, how does nimo make a single leg of 7000 volts into 2 legs of 110 volts 180 outa phase? I know how trausformers work but dont get how the negative phase gets created?"

[person A]:        "Ill show you a book you will like
                   tommorrow.  Its in my locker."

CRAWFORD:          "Thanks bud!"

Your affiant believes these text messages refer to CRAWFORD's request for technical assistance from person A with respect to providing power to CRAWFORD's radiation emitting device.

83.) On February 6, 2013, between 1:46 p.m and 7:27 p.m., CRAWFORD, using Crawford Telephone #2, sent and received multiple text messages with FEIGHT.  The first message was sent by CRAWFORD: "For the relays i got [reference to technical specifications] Will this be ok?" to which FEIGHT responded, "I'm at autoclaves right now.  I'll look at the drawing when I get home and let you know."  CRAWFORD then wrote "Ok. If I knew you were comin ida stayed.  Thanks!"  Finally, FEIGHT responded with "Just checked, that should work."  Your affiant believes that this conversation references whether or not certain parts will work in the construction of the remote initiation device for the radiation emitting device.

84.) On February 7, 2013, at 9:47 a.m., CRAWFORD, using Crawford Telephone #2, sent a text message to UCE #1: "Send up a debit card w 1200 on it.  Im developing an asset for you on the reytrofit.  Sorry bout all the hasssle."  A little over an hour later CRAWFORD sent another text message to UCE #1 which stated "May i give him your number? I told him a machine a needs control circuits retrofitted."  UCE #1 responded via text at 12:09 p.m. and said "Will send money to the big man he Will call wrench he has it  dont give my number out till we talk."  At approximately 2:25 p.m. on February 7th, UCE #1 called CRAWFORD on the Crawford Telephone, and CRAWFORD stated, "I got an asset for you, do you wanna meet him?"  UCE #1 responded by saying that he wanted to meet him once the order was made and the parts required to build the remote initiation device were in.  Both parties agreed to have "the Big Man" deliver $1,200 via debit card(s) to CRAWFORD in order for CRAWFORD to set up the purchase of the parts required for the remote initiation device.  Subsequent to this conversation, on February 9, 2013, at approximately 12:03 p.m., the CHS called CRAWFORD.  During

this conversation a meeting was set up for Thursday, February 14, 2013 at 3:30 p.m.

85.) At approximately 9:12 a.m., on February 11, 2013, CRAWFORD, using the Crawford Telephone, called telephone number 518-370- xxxx - a number that belongs to a supply store near Albany, New York. CRAWFORD stated "I am looking for, ah, little red or green indicator lights. I am gonna need a couple of them for something I am building. Ah, you guys got stuff like that?" The individual who answered the phone verified they sold parts, and they were in stock. CRAWFORD said he would visit the store after work. At approximately 3:09 p.m. that same day, CRAWFORD was surveilled entering the store and at approximately 3:16 p.m., CRAWFORD was seen exiting the store with a small package in his hand. CRAWFORD arrived at, and departed from, the store in his Saturn vehicle. Your affiant believes that CRAWFORD purchased the red and green indicator lights while at the store and that the parts are to build the remote initiation device for the radiation emitting device as per the parts list given to CRAWFORD by FEIGHT on or about January 11, 2013.

86.) On February 14, 2013, CRAWFORD met with the CHS at the the coffee shop near Albany, NY. As CRAWFORD had previously requested, he was provided with two debit cards containing a total of $1,000 ($500 * 2). While in the presence of the CHS and using the CHS's cellular telephone, CRAWFORD called a parts supply store, placed an order for a [reference to technical information], and instructed the salesperson to have the kit shipped to a local residence (not CRAWFORD's). Also during the meeting with the CHS, CRAWFORD called the residence's owner, and received permission to use that residential address as a mail drop proxy for CRAWFORD with regards to the [reference to technical information]. During the call, the other person asked CRAWFORD, "I'm not gonna go on the fuckin' federal hit list for this am I?"

87.) On February 19, 2013, at approximately 9:37 a.m., CRAWFORD using the Crawford Telephone, called FEIGHT. The call went to voicemail and CRAWFORD left the following message, "This is Scott. Ah, I was wondering if you were gonna make it up to GE today. If not, the ah, well just wondering where you were gonna be. Ah, I'll talk to you later. See ya".

Approximately two minutes later FEIGHT called CRAWFORD on the Crawford Telephone and told CRAWFORD "I will be back there at some point this week but not today.  I am not sure which day yet."   Subsequently, CRAWFORD stated "So, person C said you might be back today, so I got a bunch of stuff an ah I got a bunch of stuff for ya.  So, but ah, I will see you when you are here…"   Your affiant believes the above messages refer to CRAWFORD wanting to meet up with FEIGHT in order for CRAWFORD to give FEIGHT the parts required to build the remote initiation system for the radiation emitting device in the second branch of the investigation.

88.) On February 22, 2013, at approximately 2:51 p.m., CRAWFORD, using the Crawford Telephone, called FEIGHT and left a message.  CRAWFORD stated "Hey Eric, this is Scott again.  Hey I wanted to talk to you about a revelation I had about the chargers anyway.   UM…the ah…since the…since the factory didn't have something to meet our needs…ah…I think I finally dreamed up what we are gonna have to do here.   Ah…circuit wise, it is pretty close to something off the shelf.   Um…I'll…ah…first chance I get to get ahold of you, let me know.  I will be in and around Schenectady til close to 5 o'clock.  If you can…ah…if you can make it here in time."   Your affiant believes this message is in reference to the parts CRAWFORD could not obtain, but were required to construct the remote initiation system.  The message also shows CRAWFORD devising a possible work around to ensure the construction of a working remote initiation system.

89.) Also on February 22, 2013, at approximately 3:49 p.m., CRAWFORD, using the Crawford Telephone, called FEIGHT and stated:

CRAWFORD: "I can't leave motor vehicle, they just locked the door.  OK.  But the Saturn.  Well the Saturn.  If you pull in.  Drive past Burger King.  Pull in and I got the trunk of the Saturn unlocked.  OK.  You can…ah…you can go and get it.  It's the big box in the middle of the back."

FEIGHT:    "What color is it?"

CRAWFORD: "Its purple."

Later in the conversation, CRAWFORD once again said "There's a box in the trunk. I unlocked it. Um…and ah…you will be able to just reach around and grab the box out of there." Your affiant believes the above conversation was in reference to FEIGHT picking up the box of parts, purchased by CRAWFORD – parts that comprise those needed to construct the remote initiation system.

90.) On February 23, 2013, at approximately 7:20 a.m., CRAWFORD sent a text message to FEIGHT using the Crawford Telephone #2 and wrote "When your ready for the controller let me know and ill get it to ya." Your affiant believes that this message is in reference to FEIGHT already having been provided the parts needed to construct the remote initiation device and CRAWFORD offering to obtain the control panel to which the remote initiation device would be attached.

91.) On February 25, 2013, UCE #2 called CRAWFORD on the Crawford Telephone. During the conversation, CRAWFORD informed UCE #2 that there was a problem with the chargers, however, "between me and Yoda we're figuring out something else." CRAWFORD also informed UCE #2 that "I'll keep you posted on the progress." Your affiant believes the above conversation was CRAWFORD's way of updating UCE #2 as to the status of the construction of the remote initiation system. "Yoda" is a code name for FEIGHT and was established at a previous meeting.

92.) Also on February 25, 2013, UCE #2 sent an e-mail to FEIGHT's e-mail account. The content of the e-mail was as follows:

"Hello sir how are you? After speaking to Dimitri today I gave you a call to see if you may have an estimated time of completion on out project. We have some business up north that we need to attend to see if we could do that and come see what you have completed during the same trip. Shoot me a call or reply email and let me know if you have a time frame nailed down. Stay safe and we look forward to meeting with you soon."

93.) On February 26, 2013, at approximately 10:22 a.m., UCE #2 received a reply e-mail from FEIGHT's email account:

"My apologies for being a little out of touch. Just a little while ago I had to reset my phone and I got all of my voice

mails from last Tuesday until now! .  I have most of the parts at this point.  I hope to have most of the work done by Friday, and depending on the rest of the parts, I will have it finished and bench tested next week."

Your affiant believes the above e-mail shows that FEIGHT, as of February 26, 2013, was missing some parts needed for the construction of the remote initiation device, however, FEIGHT believed he could be ready to test a finished product during the week of March 4, 2013.

   94.) Between February 26, 2013 at 7:26 a.m., and February 27, 2013 at 10:51 a.m., the following text messages were sent and received between Crawford Telephone #2 and FEIGHT:

CRAWFORD(02/26/2013@7:26am):  "Anything else I can do to help things along?  Soon as it works we can get down to business… I know your busy, sorry to keep pushing."

FEIGHT(02/27/2013@1:21am):  "s I was expecting.  I'm looking into that."

FEIGHT(02/27/2013@6:01am):  "s I was expecting.  I'm looking into that."

CRAWFORD(02/27/2013@8:28am):  "They wana see something turn on n off before incorporating it in the machine.  Anything i can do to help?"

FEIGHT(02/27/2013@8:29am):  "s I was expecting.  I'm looking into that."

FEIGHT(02/27/2013@8:29am):  "I am going to need the second enclosure and back planes for both.  I think I can come up with din rail and a switch. The radios don't have the dip switche"

FEIGHT(02/27/2013@8:29am):  "Did you mean to leave the credit card in the box?"

FEIGHT(02/27/2013@8:29am):   "Phone problems.  I just got 12 voice mails going back to last Tuesday!  I Have the power covered.  We're just using vehicle power (12 VDC)."

FEIGHT(02/27/2013@8:29am):   "I should be at GE on Friday. Let's talk then."

FEIGHT(02/27/2013@8:29am):   "I can set up a bench test to shoe that."

FEIGHT(02/27/2013@8:37am):   "That should have been "show" not "shoe".  I hate the auto correct on this phone.  We can go over everything on Friday."

CRAWFORD(02/27/2013@8:38am):   "Ill need that back, long story. Waddaya need for an enclosure, same one?  That came from them, you can  order it with the switches or i can get a comparable one from grainger.  Daddy warbucksll cover it, if you need cash ill get it to you."

CRAWFORD(02/27/2013@8:41am):   "Splendid.  Can you get the switches n enclosures n ill getcha the cash?  Or you need me to?  Im out tomorrow if  it helps"

CRAWFORD(02/27/2013@9:10am):   "Are you due to come here soon or should I come to you?"

CRAWFORD(02/27/2013@9:18am):   "My messages are a mess too, sorry if stuff crosses. So its Friday then?"

FEIGHT(02/27/2013@10:49am):   "I'll be there Friday."

CRAWFORD(02/27/2013@10:51am):   "Great, see you then?"

Your affiant believes CRAWFORD and FEIGHT discussed the need for preparing the remote initiation device so it could be actively

tested with some sort of electrical device before attaching it to the radiation emitting device.

95.) On February 27, 2013, at approximately 10:23 a.m., CRAWFORD sent a text message using the Crawford Telephone to telephone number 518-376-xxxx – a number believed to be used by person C. The content of the text message stated: "Send [person D] t see scott at robel 8". Your affiant believes that [person D] is the asset CRAWFORD has identified for use in constructing the remote initiation device on a contract basis for the first branch of the investigation. CRAWFORD informed the CHS on February 14, 2013 that the "asset's" was [person D] and that he worked with CRAWFORD at GE.

96.) On February 27, 2013, at approximately 4:49 p.m., CRAWFORD, using the Crawford Telephone, called the CHS. During the call, CRAWFORD asked the CHS what name the CHS used to order the parts. CRAWFORD then informed the CHS that he would give it a couple more days and if it [the part(s)] does/do not show up, then they will "get together again and start to go after this thing."

97.) On March 1, 2013, at 1:03 p.m., CRAWFORD called FEIGHT using the Crawford Telephone. The call went to voicemail and CRAWFORD left the following message:

"Eric, this is Scott. Hey buddy…ah…let me know when your back in the plant. Um…I have a couple things I want to show you. We gotta play some show and tell here…"

Your affiant believes this message shows that CRAWFORD wants to meet up with FEIGHT in order to allow either CRAWFORD or FEIGHT to show progress made with regards to the construction of the remote initiation device.

98.) Also on March 1, 2013, CRAWFORD received a call at approximately 1:19 p.m. on the Crawford Telephone from telephone number 518-376- xxxx. This phone number is believed to be used by person C. During the conversation, person C said "Hey Scotty, if you get a chance can you go and show Eric the… ah…B1A1 valve? I think..Ithink it was that one wasn't it? I am not sure, it's the one that…it's the one that opens when your running in remote." Your affiant believes person C was speaking in code to

CRAWFORD.   Your affiant further believes that person C was telling CRAWFORD that FEIGHT was at GE, and that he was there to see the parts that FEIGHT needed in order to finish construction of the remote initiation device for the second branch of the investigation.

99.) On March 1, 2013, the CHS called CRAWFORD on the Crawford Telephone.  During the first call, CRAWFORD and the CHS set up a meeting for Tuesday, March 5, 2013 at 4 p.m. at the coffee shop.  CRAWFORD told the CHS to have his phone charged and to bring his debit card.  During the second call, CRAWFORD advised the CHS that the kits that they ordered previously on February 14, 2013 were missing parts, as per the engineer with whom CRAWFORD was working (presumably FEIGHT).  CRAWFORD also stated that he developed an asset to assist with the fabrication of the remote initiation device.  Your affiant believes that CRAWFORD and the CHS made plans to schedule a meeting in order to discuss the previous parts order made on February 14, 2013 for the Radio Kit, and to order the parts missing from the kit, using the CHS's remaining $200 debit card.

100.) On March 5, 2013, at approximately 12:11 p.m., the CHS called CRAWFORD on the Crawford Telephone to confirm their meeting scheduled for later that afternoon.  At approximately 3:48 p.m., CRAWFORD met with the CHS at the coffee shop near Albany. CRAWFORD informed the CHS that he needed the CHS's telephone to make some calls.  The CHS responded that he did not have his telephone with him.  CRAWFORD then stated, "I can't have them on my phone."  CRAWFORD told the CHS they would have to postpone their planned activities and that CRAWFORD would take care of it.  Your affiant believes that this conversation shows CRAWFORD reluctant to use the Crawford Telephone, a telephone traceable to him, to call to order parts for a remote initiation device.

101.) On March 6, 2013, CRAWFORD made an outgoing call using Crawford Telephone #2 to telephone number 518-869-xxxx - the number for a parts supply store.  CRAWFORD left a message for a salesman and stated, "Good morning [salesperson], this is [false first name]…..  I spoke to you a couple of weeks ago…ah…in order to buy…ah… [reference to technical equipment]. It hasn't arrived…ah…I'd like to know what is going on.  Ah…if

the stuff is there…ah…I'll come get it.  Ah…could you get ahold of me on this phone…ah…and ah…as soon as you can so we can please find out what happened and where my stuff is and…ah…the status…ah…as soon as we can.   I'll keep trying you during the course of the day until I get ahold of you.  Ah…if you could give me a call back at this number I would appreciate it.   Thank you."   Your affiant believes CRAWFORD was attempting to determine what happened to the order he made for the [reference to technical equipment] on February 14, 2013.  Your affiant also believes that CRAWFORD was attempting to maintain operational security by using Crawford Telephone #2, and that his use of the false name shows he did not want his name connected to the purchase.

102.)  Later on March 6, 2013, CRAWFORD made another outgoing call, using the Crawford Telephone #2, to telephone number 518-869-xxxx.  CRAWFORD began the call by saying, "Hey [salesperson] this is [false name].  I spoke to you a couple of weeks ago about…ah…a couple of [reference to technical equipment]."  Subsequently, CRAWFORD said, "I wanted a couple of [reference to technical equipment]…ah…I was gonna have them shipped to my place and…ah…ah…they never got there."   The salesperson responded, "Yeah, I remember now.  Yep, well I tried calling you back at those numbers and neither one of them worked.   The problem was we tried to process the first credit card and it was denied.   It was declined for that amount."  CRAWFORD went on to give the credit card numbers used to make the purchase on February 14, 2013 to allow the salesperson to use those cards to make the purchases.  Your affiant believes CRAWFORD was trying to maintain operational security regarding the purchases by not using his name and by using Crawford Telephone #2.  The [reference to technical equipment] were to be used to fabricate the remote initiation device in connection with the first branch of the investigation.

103.) Also on March 6, 2013, at approximately 11:06 a.m., CRAWFORD received a call on Crawford Telephone #2 from telephone number 716-691-xxxx - a number that belongs to a supply store. The store informed CRAWFORD that amount of the purchase would exceed the amount that could be charged on the cards given to them by CRAWFORD.  CRAWFORD then said he would go to the Office and pay for the units in cash.   Subsequently, at 11:19 a.m.,

CRAWFORD made an outgoing call using Crawford Telephone #2 to telephone number 877-770-xxxx.   CRAWFORD called this number to check the balance on the pre-paid debit cards he had given ~~to~~ to purchase the radio kits.   CRAWFORD confirmed the balance of the card to be $500.   CRAWFORD then made a similar call, using Crawford Telephone #2, to 800-571-xxxx to verify that the balance of the other pre-paid debit card given was also $500.

104.)  On March 7, 2013, at approximately 10:52 a.m., CRAWFORD, via Crawford Telephone #2, sent a text message to UCE #1.   The message stated, "Cards still didn't fly. You want me to try turn em into cash n give it to a proxy or you want the cards back n try something else?"   At approximately 11:01 a.m. that same day, UCE #1 called CRAWFORD on Crawford Telephone #2.   In that call, UCE #1 agreed to purchase parts needed to assemble the remote initiation device using an individual known by CRAWFORD.   CRAWFORD informed UCE #1 that person C is one of us, but not in the game, but "[person C]'s good for it."   Your affiant believes that CRAWFORD was identifying a contact of his who would assist CRAWFORD in purchasing parts for a remote initiation device.   Your affiant further believes that person C is that contact.

105.)  On March 7, 2013, at approximately 2:52 p.m., CRAWFORD, using the Crawford Telephone, called telephone number 518-376-xxxx  - a number belonging to General Electric. Your affiant believes that person C, uses that telephone and participated in that call with CRAWFORD.   During that telephonic conversation, CRAWFORD asked the person who answered the telephone, "so everything is all squared away?" The person replied, "Absolutely. We're good."   At approximately 5:13 p.m. that same day, the Crawford Telephone received a text message from telephone number 518-376-xxxx.   The message stated, "I was not avoiding u in the office just did not want to take a chance of anyone hearing especially [co-workers]."   Your affiant believes that this telephone call and text message concern the purchase of parts needed to construct the remote initiation device in connection with the first branch of the investigation.

106.)  On March 11, 2013, at approximately 11:40 a.m., CRAWFORD, using the Crawford Telephone, sent a text message to telephone number 518-605-xxxx  - the number for the coffee shop

near Albany, New York: "Can you get that enclosure ordered asap and order t backplanes with it? Asap." I believe CRAWFORD sent this text message to person E asking person E to order three parts CRAWFORD needed to build the remote initiation device in connection with the second branch of the investigation.

107.) On March 11, 2013, CRAWFORD, using Crawford Telephone #2, sent a text message to FEIGHT. The message stated, "Hey buddy, makin any progress?" That same day, FEIGHT responded and wrote, "Really swamped right now. I'll update you in the morning."

108.) On March 11, 2013, at approximately 2:42 p.m., CRAWFORD, using the Crawford Telephone, called telephone number 518-269-xxxx - a number used by person C. During the conversation CRAWFORD asked to meet up with person C to drop something off. Subsequently, CRAWFORD, using Crawford Telephone #2, sent a text message to UCE #1. The message stated, "Gave fifteen to my asset t make sure all goes well, started chewin through th first two cards. We can settle up when the dust clears." Your affiant believes that CRAWFORD gave person C, who is believed to be his "asset," $1,500.00 to allow that person to order and pay for parts required to build the remote initiation device in connection with the first branch of the investigation.

109.) On March 12 2013, using Crawford telephone #2, CRAWFORD sent a text message to FEIGHT: that stated "Enclosure sand backplanes allegedly enroute eta 7 TO 10 days Daddy warbucks is ready to go whenever you can make it fly." Your affiant believes this message shows CRAWFORD informing FEIGHT that the remaining parts had been ordered, and that UCE #2 and UCE #3 were awaiting the outcome of the assembly of the remote initiation device.

110.) On March 13, 2013, using Crawford Telephone #2, CRAWFORD texted UCE #1: "Sorry for the delays. Doin the best I can…If it helps soothe I put the fifteen c note sin good faith to my asset before I even finished the one large in cards, I profit nothing here. Im investing in your success with little potential benefit at great risk for myself. Mr big had expressed concern so I felt compelled to remind we are on the same side here. Merchandise will be enroute asap, remember, between the handjob sales staff and dicey market conditions im

negotiating a minefield here, even my wife has no idea what im doin here." Later that same day, UCE #1 responded via text to Crawford Telephone #2 and stated "No issues on my end big guy was out of line  I didn't have a chance to talk to him after you texted me"  CRAWFORD then responded, "No sweat, all concerns are legit, and with all the delays im bummed out too.  But at this point all step shave been forward, albeit small ones.  Thanks for understanding my plight, we will succeed here. Thanks for everything."

111.) Also on March 13, 2013, using Crawford Telephone #2, CRAWFORD sent a text message to UCE #2 and stated "Youd probably speed the final outcome a bit If you were to contact the prior owners  of the unit and duplicate the incoming power setup, and start laying out a floorplan to secure it all to. Or is that done already??"

112.) On March 13, 2013, FEIGHT texted CRAWFORD on Crawford Telephone #2 and stated "I'll be at the paint booth tomorrow. Let's catch up then."  On March 14, 2013, FEIGHT called CRAWFORD on Crawford Telephone #2 during which call CRAWFORD asked FEIGHT if he was at the paint booth?  When FEIGHT responded yes, CRAWFORD advised he would be right there. Approximately three hours later, FEIGHT again called CRAWFORD on Crawford Telephone #2 and advised that he had the "interlock thing" wrapped up but that he still wanted to talk with CRAWFORD about the pins retracting real quick. CRAWFORD advised FEIGHT that he would meet up with him in a couple minutes.

113.) On March 15, 2013, CRAWFORD sent a text message to telephone number 518-269-xxxx – a number believed to be used by person C. The message stated:  "Where are you now? I had some errands. I can come t ge or your house."  Approximately two minutes later, CRAWFORD received a telephone call from person C on the Crawford Telephone.  CRAWFORD agreed to stop by person C's residence on his way home.  At approximately 5:14 p.m. that day, CRAWFORD, using the Crawford Telephone, sent a text message to telephone number 518-269-xxxx: "Cominatcha. You home?"  At approximately 5:16 p.m. that day, telephone number 518-269-xxxx sent a reply, "Yes."  Your affiant believes, based in part on a March 6, 2013 telephone call between CRAWFORD and UCE #1, where CRAWFORD told UCE #1 that he had a "[person] he could "send in

to make the purchase," and based in part on a March 12, 2013 telephone call between CRAWFORD and the CHS where CRAWFORD told the CHS that he (CRAWFORD) "gave $1,500 to my asset and [he/she]'s working on it," that CRAWFORD met with person C at person C's home that day to discuss the acquisition of parts needed to construct a remote initiation device for the first branch of the investigation.

114.) On March 15, 2013, CRAWFORD sent a text message to telephone number 518-269-xxxx – person C's telephone: "It was all there, right?" Person C quickly responded, "I'm good hope to see u guys tom nite but I may be helping daughter with her taxes." Your affiant believes that the above messages show that CRAWFORD did go to person C's residence. Your affiant also believes these messages show that while at the residence, CRAWFORD gave person C money to reimburse for the purchase of parts for a remote initiation device, and that the amount of money he provided covered the amount person C had paid for the parts.

115.) On March 20, 2013, CRAWFORD called FEIGHT and left a message stating he: "has the toys, will be in touch, and I'll call you from work."

116.) Also on March 20, 2013, CRAWFORD, using the Crawford Telephone, called telephone number 877-739-xxxx – a number assigned to an entity apparently selling testing equipment. CRAWFORD left a voicemail message stating that he was in desperate need of fp110 or fp400, 600 volts, and 10 amp fuse. CRAWFORD also stated that he would take their package of four, and requested that they call him back on telephone number of 518-421-xxxx (the Crawford Telephone). The following day, at approximately 12:46 p.m., CRAWFORD called that entity a second time. CRAWFORD stated that he needed 600v 10 amp fuse, part number fp400. CRAWFORD repeated that he was desperate for these parts, purchased one pack of four fuses using his personal Mastercard credit card, and requested that the parts be shipped to his personal residence. Your affiant believes that these additional parts were needed to construct the remote initiation device for the radiation emitting devices being planned in both branches of the investigation.

117.) On March 21, 2013, CRAWFORD, sent a text message to FEIGHT which stated, "Enclosure and backplanes are in, waiting on power supply and dinrail.  You want em now?"  Approximately 30 minutes later, CRAWFORD, sent a second text message to FEIGHT: "Anytime you want i can bring the parts.  Just let me know.  Everyone knows your time constraints and we will miss you in the future.  Be in touch."

118.) On March 22, 2013, at approximately 11:05 a.m., CRAWFORD called telephone number 866-841-xxxx using the Crawford Telephone.  Open sources checks indicate that telephone number 866-841-xxxx  is used by a business that provides, among other things, internet and email services.  During this call, CRAWFORD requested cancellation of his e-mail account (the Crawford Email Account), because he was "creeped out by Big Brother."  CRAWFORD stated that he wanted the account closed and his data scrubbed. He further requested, however, that the company keep his credit card on file as he might want to reopen his account in the future.   On March 30, 2013, using the Crawford Telephone, CRAWFORD made two more outgoing calls to the company at the same number.   In these telephone calls, CRAWFORD sought to re-establish the e-mail account he had canceled on March 22, 2013. CRAWFORD appeared to re-open the aforementioned e-mail account during the second of these intercepted telephone calls.

119.) On March 22, 2013, CRAWFORD sent a text message to FEIGHT: "Dinrails in. You want me to drop it off?  I can come tnite, tmorrow, now you call it.   Ill  bring  candy…" Approximately four minutes later, FEIGHT responded via text message: "Saturday and Sunday are both booked.  I can pick up everything Monday.  I have to be in the area but I'm not sure of the time yet."

120.) On March 25, 2013, sent a text message to FEIGHT: "Waitin with bells on. And parts."  FEIGHT replied: "Leaving Albany now.  I'll call when I get to the gate."

121.) At 1:41 p.m. that same day, FEIGHT made a telephone call to CRAWFORD.  During the call, FEIGHT told CRAWFORD that he was at the General Electric plant in Schenectady (CRAWFORD's workplace and also a commercial customer of FEIGHT's), right outside the Maintenance Office.  CRAWFORD called FEIGHT back a few minutes later and informed FEIGHT that he (CRAWFORD) had the

"stuff right here" and that he was on his way to meet FEIGHT. Based on these intercepted telephone calls over Crawford Telephone #2, and subsequent communications between CRAWFORD and FEIGHT (described below), your affiant believes that CRAWFORD met with FEIGHT that day and that CRAWFORD gave FEIGHT parts to build a remote initiation device to be used to remotely initiate a radiation emitting device in the first branch of the investigation.

122.) On March 25, 2013, at approximately 12:39 p.m., CRAWFORD, via Crawford Telephone #2, sent a text message to telephone number 518-605-xxxx  – a number used by the coffee shop near Albany, New York (operated by CRAWFORD's acquaintance, person E). Prior communications between CRAWFORD and person E have shown that CRAWFORD used person E as a proxy for CRAWFORD in receiving and holding parts for remote initiation devices. The text message stated, "Hello, have the resources made it to you? I can stop and order if you are ready." No electronic response from person E has been intercepted, however, the investigation has obtained other information indicating that CRAWFORD visited the coffee shop on multiple occasions, including a meeting there with the CHS on April 2, 2013.

123.) On March 27, 2013, CRAWFORD called telephone number 518-858-xxxx  using the Crawford Telephone, and said, to a person D, "I just wanted to make sure I got a hold of ya, you know, ah, I didn't know if you were coming back or what? If you were never coming back I wanted to talk with you about the side work coming up, so…." Person D responded, stating, "No. I'm probably going to be coming back tomorrow regardless. I just needed another day." On March 29, 2013, CRAWFORD once again called that telephone number, using the Crawford Telephone, and asked to meet with the recipient of the telephone call, who again identified himself as "person D." Your affiant believes the above telephone calls show CRAWFORD recruiting an individual to assist in fabricating a remote initiation device once all parts required had been procured. Your affiant believes this activity relates to CRAWFORD's involvement with the first branch of the investigation. CRAWFORD previously referred to this individual in a conversation with UCE #1 and told UCE #1 that he ("[person D]") would be willing to assist CRAWFORD on a contract basis. CRAWFORD also told UCE #1 that person D was "not in the

game," a statement he reiterated on April 1, 2013 during a telephone call between CRAWFORD and UCE #1 over Crawford Telephone #2. Your affiant believes that CRAWFORD's reference to person D as "not in the game" means that CRAWFORD has not yet shared with that person information about the radiation emitting device scheme or its purpose.

124.) On April 1, 2013, CRAWFORD spoke with UCE #1. CRAWFORD told UCE #1: "there is one more thing Im working on getting….and I was gonna grab the stuff on my way home tonight." At approximately 5:03 p.m. that same day, CRAWFORD received, via the Crawford Telephone, a text message from telephone number 518-269-xxxx, a telephone utilized by person C at GE. This text message, and the following exchange of text messages, sent/received over the Crawford Telephone and the above-referenced telephone number utilized by person C, were as follows: Person C replied, "I'm homew." CRAWFORD responded, "Done w errands, got a belt n stuff from rus n rebel, workout powder from elite fitness n an electronic flxswatter from harbor freight tools in colonie. Homing, eta unknown." At 5:34 p.m., person C responded, "K I'll be here." At 5:44 p.m., CRAWFORD updated person C via text message, stating, "Half hour or so." At 5:53 p.m., person C responded, "K." Your affiant believes CRAWFORD planned to meet person C at person C's residence to retrieve parts or components for a remote initiation device that person C had obtained while acting at CRAWFORD's direction as his proxy.

125.) On April 2, 2013, the CHS called CRAWFORD. During their conversation, the CHS asked CRAWFORD if they could meet later that day. CRAWFORD said, "Sure. I got your toys right in the trunk of my car. You wanna meet…ah…I will meet you at the coffee shop." Subsequently, they set up a meeting for approximately 3:00 p.m. that afternoon at the coffee shop. At approximately 3:21 p.m., CRAWFORD met the CHS at the coffee shop. CRAWFORD arrived at the meeting in his Saturn vehicle. During the meeting, CRAWFORD gave the CHS parts to build a remote initiation device for a radiation emitting device, specifically, CRAWFORD gave the CHS two cardboard boxes containing various parts. The CHS then gave CRAWFORD $200 to cover the remaining cost of those parts. Both of the cardboard boxes had shipping labels that were addressed to person C at

person C's home address and had return addresses from an identified parts supply store.   CRAWFORD informed the CHS that he had additional parts, identified as relays, in his basement that he would get to the CHS.   Your affiant believes that the two boxes of parts that were procured by person C as CRAWFORD's proxy, then given to CRAWFORD (who ultimately gave them to the CHS, as described above), were to be used in the construction of a remote initiation device for the first branch of the investigation.

126.) On April 5, 2013, CRAWFORD sent a text message to FEIGHT: "Hey buddy, any progress? Anything i can to help move things along? Leme know."

127.) On April 6, 2013, CRAWFORD sent a text message to FEIGHT: "Any news? Got toys poised to if your inclined…." Your affiant believes CRAWFORD sent the above text message to check with FEIGHT on the status of FEIGHT's efforts in constructing the remote initiation device for the second branch of the investigation.

128.) On April 8, 2013, CRAWFORD sent a text message to FEIGHT: "Mornin buddy, any news? Once we are off the ground i promise i won't bug you anymore. If itll help i got a nice present….waaaaay better than Chinese food…."   FEIGHT responded by text message and wrote "will update you in a few minutes." At 7:07 a.m. FEIGHT sent a text message to CRAWFORD: "I've been wrapped up in the start-up from Hell. I haven't had time for anything else. I should be back on your project tomorrow or Wednesday."   At 7:09 a.m., FEIGHT sent another text message to CRAWFORD stating, "I am going to need some coard grips. I'll get you the [supplier] part number."   Your affiant believes that the above exchange of text messages concerns the status, and the temporary delay, of FEIGHT's efforts to construct the remote initiation device for the second branch of the investigation.

129.) Also on April 8, 2013, CRAWFORD sent a text message to FEIGHT: "Ill get em soon as number arrives ….Wiring connectors are in process too, not amphenol but comparable heavier duty stuff.   Sorry t be a constant pest, and im rooting for you start up too.   No doubt im going to need a livelihood when my present one gets out of reach, they always do. Your affiant believes that this text message shows CRAWFORD's

49

continued urging of FEIGHT to complete assembly of the remote initiation device.

130.) On April 9, 2013, UCE #2 placed a telephone call to CRAWFORD on the Crawford Telephone. CRAWFORD stated, "… it's not gonna hold anything up, but there are a couple little items I'm picking up for the final product, you know when the conversion-slash-alteration starts to happen…. I've been doing some research that I think will be intriguing for you guys. The research end of things, umm, ah, shows a lot of promise, a lot of promise that, you know, the set up…the set up we're building here is going to be fairly effective but you know, the future plans we discussed, ah, I found some enormous, enormous market potential. I think you guys will be tickled fucking pink." Later in the telephone call, CRAWFORD stated "I have my fingers in the pie. And I'll keep you apprised. I'm pushing as hard as I think will be effective and I, you know, and everybody involved, you know everybody involved understands, you know, the marketing costs at stake here….from a marketing standpoint, as far as I can discern we are going to be all alone, ah, so, you know, our people will pretty much have the corner on this and, ah, it's going to be very, very effective." CRAWFORD stated later in the same telephone call, "I was going to take a vacation day tomorrow and do a big, big, another big piece of research that I think will benefit us even more so, and then I'll be in touch when we're ready to move." At the end of the conversation, CRAWFORD stated, "Hey, look, tell your people thank you for your patience. Been a lot of complications. Been a lot of setbacks, ah, I, all I can do is beg for forgiveness and promise you the product will be worth the wait…….Like I said, from an industry and commerce standpoint, this is going to be the world's first, so…I think I mentioned to you guys at our first meeting, things that had to be overcome." Your affiant believes that this conversation shows that CRAWFORD is continuing to move forward with his plan to build the remote initiation device, his plan to interface the remote with an industrial strength x-ray machine in a weaponized fashion, and his intent to develop this weaponized technology for additional future criminal events.

131.) On April 9, 2013, CRAWFORD called number 518-376-xxxx - the telephone associated with person C at GE in Schenectady,

New York. That telephone call included the following conversation:

Person C:        "yeah Scotty?"

CRAWFORD:        "Hey, if you wanna have a good laugh tomorrow if anybody comes around

                 asking…. If anybody over here asks for the (UI), tell them I'm in a job interview."

Person C:        "It's what?"

CRAWFORD:        "Tell them I'm at a job interview."

Person C:        "Oh" (laughing) "gotcha."

CRAWFORD:        "See ya."

Person C:        "Thanks.  Bye bye."

        132.) Your affiant believes the above call shows that CRAWFORD advised person C in advance that he planned to take the next day (April 10, 2013) off from work and, based on the person C's response and prior assistance to CRAWFORD as a proxy for him in obtaining parts for a remote initiation device, that CRAWFORD had shared with person C information about his planned activities for that day.  Your affiant further believes that CRAWFORD's words in this telephone call, and his language in his telephonic conversation earlier that day with UCE #2, indicate that CRAWFORD believes: (a) he is the first to push to a weaponized level a working, radiation emitting device that can kill humans from a distance silently and without detection; (b) that his radiation emitting device has "enormous market potential;" and (c) that because of its lethal nature, and his device's stealth and remote initiation capabilities, it will be "very, very effective."

        133.) Additionally, CRAWFORD's inside joke that he was "at a job interview," when combined with cell site / GPS data on CRAWFORD's Crawford Telephone on the day he took off from work (April 10, 2013) showing that he traveled to the immediate vicinity of the manufacturer of the [x-ray system UCE #2 and UCE #3 claimed to have access to], appears to confirm that CRAWFORD has future plans for his radiation emitting device. These

conclusions are further supported by the statement CRAWFORD made to UCE #2 on April 9, 2013, in which CRAWFORD described taking the day off from work to do "big piece of research that I think will benefit us even more", as well as "the future plans we discussed, ah, I found some enormous, enormous market potential." Through the use of Court-authorized GPS and cell tower location information for the Crawford Telephone, investigators have confirmed that CRAWFORD did in fact take April 10, 2013 off from work, and traveled in his Saturn vehicle (paying with cash at at least one of the toll booths, from the Albany, New York area through Springfield, Massachusetts and Hartford, Connecticut) to a town in Connecticut.

134.) The above location is significant because approximately 500 feet from the above location data is [location of the manufacturer of the x-ray system UCE #2 and UCE #3 claimed they had access to]. [8] Similarly, the x-ray system referenced by UCE #2 and UCE #3 is the device into which CRAWFORD and FEIGHT plan to integrate the remote initiation device in order to weaponize their radiation emitting device.

135.) On April 9, 2013, sent a text message to FEIGHT: "Hey buddy im ready for those part numbers. And connectors are enroute." Your affiant believes CRAWFORD asked FEIGHT for the part number that FEIGHT stated he needed in his previous communication to CRAWFORD on April 8, 2013. This part does not appear to be necessary for the remote initiation device itself, as demonstrated by the communication described in the following paragraph, but rather apparently relates to the next necessary step in the process: integration of the remote initiation device into the x-ray system.

136.) On Wednesday, April 10, 2013, FEIGHT sent a text message to CRAWFORD: "Just finished preliminary testing on the [reference to electrical component]. They functioned flawlessly on a [reference to a technical identifier]."

137.) The next morning, CRAWFORD sent text messages to FEIGHT: "Wonderful. Are you ready for me to pass the word along.

---

[8] Although CRAWFORD had originally hoped to obtain a top-of-the-line system from UCE #2 and UCE #3, CRAWFORD now expected to receive a less powerful system after UCE #2 and UCE #3 told him that they could not obtain the larger, more powerful x-ray system that he had originally selected.

Ill order your stuff as soon as you gimme the number and bring em with the rest of the stuff which are also enroute" and, "and thank you. Profusely Ill make this worth your while."   Your affiant believes these text messages show CRAWFORD (i) acknowledging that assembly of the remote initiation device has been completed, and (ii) asking FEIGHT whether FEIGHT agrees it is time to contact the individuals they believe have access to the x-ray system (UCEs #2 and #3) and invite them back to the Capital District to witness a demonstration of the remote initiation device.[9]

138.) On April 11, 2013, person C called CRAWFORD on the Crawford Telephone.   Person C stated, "Hey Scotty, I've got some toys for you." CRAWFORD responded, "where you at?"   Person C replied, "at my desk."   CRAWFORD said, "oh alright." Person C then stated, "They are from [person F]."   CRAWFORD concluded the conversation stating, "alright."   Your affiant believes that person C informed CRAWFORD that person C and/or person F had again acted at his direction as his proxy and was in possession of additional parts CRAWFORD needed for the remote initiation device or the interface with the x-ray system.

139.) On April 15, 2013, CRAWFORD sent a text message to FEIGHT that stated "Want me to pass any word along?   Or order the wire retainers?   Poised.   Ready."

140.) On April 15, 2013,—FEIGHT sent text messages to CRAWFORD via the Crawford Telephone #2.   The first message said:

[store name] List:

[reference to technical identifiers for parts]

The second text message said:

[another store name]:

[reference to technical identifiers for parts]

---

[9] CRAWFORD previously had discussed with UCE #2 and UCE #3 that, when ready, he and FEIGHT would have UCE #2 and UCE #3 visit them in the Albany, NY area to witness a demonstration of the remote initiation device to confirm it was ready to connect to the radiation emitting device, i.e. the x-ray system.

Your affiant believes the above text messages represent part numbers needed by FEIGHT to finish construction of the remote initiation device for the second branch of the investigation.

141.) On April 15, 2013, FEIGHT sent another text to CRAWFORD, which stated "If you get the parts, I'll need about a day to put everything together."

142.) On April 15, 2013, CRAWFORD, sent text messages to FEIGHT.  The content of these messages was: "On it" and "Ill have em ordered tnite, what are the names under?"

143.) On April 15, 2013, called FEIGHT from an electronics supply store in the Albany, New York area to clarify which part(s) FEIGHT needed.  FEIGHT informed CRAWFORD he was looking for something that had a USB output on it.  CRAWFORD then informed FEIGHT that the sales person found what they were looking for and described one of them as "10 amps."

144.) On April 15, 2013, CRAWFORD, sent a five-part text message to an identified individual.  The content of the text message(s) follow below:  "Well, tell it to your treasonous bedwetting maggot in chief.  He started bringing the scumbags have wholesale as he got in charge.  He directed the ins to start bringing muzzies here without background checks.  Your background was scrutinized more to join the army than any muslim scum gets to come here.  They don't have to follow any laws, and this administration has done more to enable a government sponsored invasion than the press can cover up.  Be pissed, but get the word out that obamas policies caused this.  You watch, they will downplay the muslim angle if they dont cover it up. Be pissed.  I am too.  I been warning this was coming.  Its here."

145.) On April 17, 2013, CRAWFORD sent a text message to FEIGHT: "Got your parts, soon as the tool gets here ill let ya know."  Approximately 11 minutes later, FEIGHT responded: "Cool".

146.) On April 19, 2013, CRAWFORD called telephone number 518-374-xxxx – a number belonging to an identified electronics supply store.  During the call, CRAWFORD asked the salesperson for a U.S. made "multimeter," to which the salesperson responded

that they did not have one.  Your affiant believes that this call is another example of CRAWFORD attempting to acquire the parts necessary for construction of the remote initiation device in the second branch of the investigation.

147.)  On April 19, 2013, multiple text messages were exchanged between CRAWFORD and FEIGHT.  The following are the referenced text messages:

CRAWFORD to FEIGHT (11:42 am):    "Delivery on the necessary items were eight weeks so im having a guy here assemble em with wires out each side pigtail style.  Wires eighteen gauge, max itll handle.  If anything needs more juice we could double up on the wires.  That oughta drive the components involved, shouldnt it?"

CRAWFORD to FEIGHT (11:43 am):    "I think youll be pleased with the stuff."

FEIGHT to CRAWFORD (11:45 am):    "You should be more than fine with that.  We're only interfacing with pilot devices."

CRAWFORD to FEIGHT (11:49 am):    "I figured, but I just wanted your stamp of approval before i gave ya the stuff. Seeya when ya get her."

CRAWFORD to FEIGHT (1:50 pm):    "The amphenol connectors wont work for some reason.  Ill show ya Monday.  Hes trying t figure it out, maybe we can use a standard outlet and plug?  It makes code, carries plenty of current and will work for other reasons.  With

12/3 it would have 3 plus a
ground.  Maybe?"

FEIGHT to CRAWFORD (1:52 pm):     "Lets look at it on Monday."

CRAWFORD to FEIGHT (1:52 pm):     "Ok."

148.) On April 22, 2013, CRAWFORD sent a text message to
FEIGHT.  The content of the message sent stated, "Got remainder
minus amphenol, ill deliver that once its straightened out.
Awaiting notice."  Your affiant believes this message informed
FEIGHT that CRAWFORD had all the parts ready to give to FEIGHT,
minus the amphenol connectors.  Your affiant also believes that
CRAWFORD had another individual (possibly an unidentified GE
employee) who was working on putting the amphenol connectors
together.

149.) On April 22, 2013, FEIGHT called CRAWFORD.  FEIGHT
informed CRAWFORD that he was at GE, in the parking lot.
CRAWFORD told FEIGHT that he would get the parts out of his car
and meet FEIGHT in the parking lot.  FEIGHT offered to move his
car closer to CRAWFORD's car in order to make it easier to
transfer the parts from CRAWFORD's car to FEIGHT's car.  Your
affiant believes that CRAWFORD gave FEIGHT the rest of the parts
needed to construct the remote initiation device (minus the
amphenol connectors) in the second branch of the investigation.

150.) On April 22, 2013, UCE #2 called CRAWFORD. CRAWFORD
stated, "I gave a box of parts, hopefully the last box of parts,
to Yoda this morning and ah we are proceeding in pace."
CRAWFORD also said "I am still not done.  I got some other
things I need to look into."  Your affiant believes that when
CRAWFORD said he has "other things" he needs to look into,
CRAWFORD was referencing conducting target reconnaissance for
the second branch of the investigation.

151.) At approximately 3:11 p.m. on April 22, 2013, the CHS
met CRAWFORD at the coffee shop.  CRAWFORD arrived to the
meeting in his Saturn vehicle.  CRAWFORD gave the CHS a small
cardboard box containing various electrical components.  Also
inside the box was an order form which identified "[person G]"
telephone number 518-385-xxxx, as the individual who called in
the order. The shipping address was CRAWFORD's workplace.  Also,

during the face-to-face conversation between CRAWFORD and the CHS, CRAWFORD informed the CHS that he still owed the CHS some more parts and that CRAWFORD had a guy from GE putting the amphenol connectors together for him.   According to CRAWFORD, once the amphenol connectors were complete, CRAWFORD would advise the CHS in order for the CHS to take it (presumably the amphenol connectors) from CRAWFORD.   CRAWFORD told the CHS that the individual who was putting the amphenol connectors together does not have any knowledge of what they are going to be used for.   CRAWFORD also told the CHS that he may be heading down to see their mutual friend (UCE #1 who has reported that he/she lives in New Jersey) sooner than he thought because he has to make a trip to NYC.   CRAWFORD then told the CHS "I gotta make a trip to New York City, if I told you why you'd wanna punch me in the head but its gonna be for the better, so…"   Your affiant believes that CRAWFORD had someone at his work (GE) make the purchase of the electrical components from [electronics supply store] for CRAWFORD in order to maintain operational security.

152.) On April 23, 2013, CRAWFORD sent and received multiple text messages to/from FEIGHT:

CRAWFORD to FEIGHT (at 6:31 pm):   "Hey buddy, any luck?"

FEIGHT to CRAWFORD (at 6:36 pm):   "Working on it a little bit at a time when I get the chance. I'm hoping to have it done and be testing by this weekend. I'll keep you posted."

CRAWFORD to FEIGHT (at 7:03 pm):   "Beautiful.  Ill pass the word.  Thank you!"

153.) On April 29, 2013, CRAWFORD received an incoming call on the Crawford Telephone from telephone number 518-385-xxxx, a telephone number believed to be used by person H (at the beginning of the call, the individual stated, "Hey Scott, it's ["person H]"). During the call, the individual stated to CRAWFORD, "Hey, we got the rest of your things done for ya." CRAWFORD responded, "No way.  Want me to come get em?" CRAWFORD told the individual, "I will meet you anywhere you want." Your affiant believes that this individual assisted CRAWFORD in

making amphenol connectors to be used in a remote initiation device in the second branch of the investigation, as discussed above.

**The Completion of the Remote Initiation Device and Scheduling A Demonstration for the Second Branch, CRAWFORD's Further Instructions to the First Branch On Building A Remote Initiation Device, and CRAWFORD's Recruiting Of An Eventual Replacement for FEIGHT**

154.)   On April 30, 2013, CRAWFORD sent another text message to FEIGHT: "Any chance of this week?"  A reply was sent by FEIGHT: "Sorry battery dying.  I'll update you with details a little later.  Problems with the lights.  Radios are working fine."

155.) On May 1, 2013, CRAWFORD sent a text message to FEIGHT: "They may be willing to use it like that.  What would i hafta do to do the demo at a location easy for all of us to get to?  A couple of little batteries and a lamp?"  FEIGHT replied: "Considering the application, operation without lights would be a BAD idea.  I already have things set up with a relay to demo functionality.  I think we need to use different lights.  I'll send part mumbers in a bit."  Based on this exchange, and your affiant's familiarity with the prior communications between CRAWFORD and FEIGHT, your affiant believes that FEIGHT indicated that he completed the building of the remote initiation device, but that he would like to replace the existing visual indicator lights (indicating on/off and operability) with different lights.  Your affiant further believes that FEIGHT's statement, "[c]onsidering the application," and his use of all capital letters for the word "BAD," reflects his knowledge that they are designing a remote initiation device to control a weaponized, industrial strength x-ray system to emit harmful/lethal ionizing radiation, and that such a device requires visual indicator lights to make clear to the operators when the device is on and off.

156.)   That same day, FEIGHT sent a text message to CRAWFORD:

[name of electronics supply store]:

58

[reference to parts and technical information]

157.) Subsequently, CRAWFRORD sent a text message to FEIGHT that stated "Great parts are enroute."

158.) On May 6, 2013, FEIGHT sent CRAWFORD a text message: "I need to be back in the area on Wednesday. I'll catch up with you then." Approximately nine minutes later, CRAWFORD replied: "Perfect! I should have it all by then."

159.) On May 7, 2013, CRAWFORD sent a text message to FEIGHT: "Parts should be here early tmorrow." Approximately three minutes later, FEIGHT responded: "Looks like my schedule will have me there around lunch time. I'll give you a call when I get there."

160.) Also on May 7, 2013, CRAWFORD sent a text message to UCE #2: "Parts should be in yodas hands tomorrow. Grooming an alternate source for control services near term. Not a world class guy but ambitious, effective and needing the work. Like minded but not committed.he doesnt know dmitri but He will serve our needs well. I can arrange an intro but I think we would be best off just dropping him off benchwork, but its your money. I am willing to be the go between if it serves our needs." "Yoda" and "Dmitri" are code names for FEIGHT and CRAWFORD, respectively, chosen by CRAWFORD at a meeting between CRAWFORD, FEIGHT and UCE #2 and UCE #3 on November 14, 2012, to be used in connection with the radiation emitting device scheme. Your affiant believes that CRAWFORD's reference to "grooming an alternate source" confirms that he: (i) continues to recruit individuals with technical and engineering skills to work on components of the remote initiation device; (ii) envisions FEIGHT eventually reducing his role as the primary engineer in building and maintaining the remote initiation device; and (iii) expects continued use of, and possibly building another, remote initiation device in the future, beyond the prototype device now being built for the second branch of the investigation.

161.) Also on May 7, 2013, UCE #2 called CRAWFORD on the Crawford Telephone #2. CRAWFORD informed UCE #2: "I don't think we will make Thursday. Ah...let me...ah...let me see what Yoda says this afternoon when I hand him the stuff." CRAWFORD also asked UCE #2, "This other fella...ah...the ah...do you want me to keep him

on the back burner for now, or ..so?"    UCE #2 responded, "Well
I mean is he gonna replace Yoda you think, is that the type of
capability (ui)?"    CRAWFORD replied, "Yeah…yeah… were gonna."
Your affiant believes this conversation shows that CRAWFORD has
taken steps to recruit one or more other persons to eventually
replace FEIGHT, and to assist with the building of remote
initiation devices in the future once the current device is
constructed.

162.) On May 8, 2013, CRAWFORD sent a text message to
FEIGHT: "Parts are here."    FEIGHT responded by text message:
"I'll be there, just not sure when."    At approximately 8:28
a.m., CRAWFORD sent another text message to FEIGHT: "No sweat,
ill make anything happen thats good for you, im here til three."

163.) Also on May 8, 2013, FEIGHT called CRAWFORD and said
"I just pulled in the parking lot."   FEIGHT also told CRAWFORD,
"I am in the first row…um…ah…of ah…parking spots right across
from A2."    CRAWFORD responded: "I will be there in moments."
FEIGHT told CRAWFORD, "I will be waiting."    A few minutes later,
CRAWFORD called FEIGHT and said "Hey buddy, is that you outside
your car?  Alright, be there in a sec."

164.) On May 8, 2013, at approximately 1:01 p.m., CRAWFORD
received a telephone call from telephone number 518-495-xxxx
(believed to be used by a family member unrelated to the
scheme).   During the call, CRAWFORD can be heard speaking to
someone in the background (a person not a party to the
telephonic conversation).   The person in the background stated
"…the light burning out and oh, crap what the heck was that…So,
I don't want that to happen."   CRAWFORD responded to the person
speaking in the background and stated:  "the light, you say, may
be burnt…OK, I'll be in touch."   Your affiant believes that the
individual speaking in the background was FEIGHT, and that
FEIGHT and CRAWFORD were discussing the indicator lights for the
remote initiation device that CRAWFORD had just delivered to
FEIGHT in the GE parking lot.

165.) Also on May 8, 2013, CRAWFORD sent a text message to
FEIGHT that stated "Any chance we could run it just for a demo
Friday?  Robin and daddy will be in town on other business, we
could demo it at my friends place."   Your affiant believes that
this text message asked FEIGHT if he would be ready to conduct a

demonstration of the remote initiation device for UCE #2 and UCE #3 on Friday, May 10, 2013.   Previously, during a meeting on November 14, 2012 between CRAWFORD, FEIGHT, UCE #2 and UCE #3, CRAWFORD chose the code names "Robin Hood" for UCE #2 and "Daddy Warbucks" for UCE #3.

166.) On May 9, 2013, between 7:49 a.m. and 9:32 a.m., multiple text messages between CRAWFORD and FEIGHT were exchanged over Crawford Telephone #2.   Pertinent exchanges are below:

CRAWFORD to FEIGHT (at 7:49 a.m.): "I can come get it."

FEIGHT to CRAWFORD (at 7:52 a.m.): "I'm not going to have it ready by then.  Out of town today and most of tomorrow.  I'll have it done and tested this weekend."

CRAWFORD to FEIGHT (at 9:32 am):   "Wooow.  Too good t be true, should i arrange the dog and pony show?  Ive already arranged a place, just leme know whens a viable time for you.  And thanks again."

167.) On May 13, 2013, CRAWFORD exchanged text messages with FEIGHT about when the remote initiation device (pertaining to the second branch of investigation) would be ready for testing.   CRAWFORD then sent a text message to UCE #2, advising that he expected the remote initiation device to be finally constructed by the end of the week.

168.) On May 14, 2013, CRAWFORD called the CHS and told the CHS that he was still in the process of getting the CHS and UCE #1 the parts they would need for their remote initiation device (pertaining to the first branch of the investigation), and that he (CRAWFORD) would try and make the instructions to be used to

hook up a remote initiation device to the X-ray system simpler to understand.[10]

169.) On May 16, 2013, CRAWFORD, called FEIGHT. FEIGHT advised that he had been working on the remote initiation device, and that he hoped to be able to meet with CRAWFORD in Albany or Schenectady on the following Monday (Monday, May 20, 2013) in order to give the remote initiation device to CRAWFORD.

**The Testing and Demonstration of the Remote Initiation Device, CRAWFORD's Plans To Connect the Remote Initiation Device To the X-ray System in the Second Branch, and CRAWFORD's Assistance to the First Branch in Assembling A Remote Initiation Device**

170.) On May 17, 2013, CRAWFORD spoke, via the Crawford Telephone, with UCE #2 and the two discussed meeting in a hotel room in the Capital District in order to test the remote initiation device.

171.) On Monday, May 20, 2103, CRAWFORD and FEIGHT exchanged multiple text messages over Crawford Telephone #2. The gist of the text messages were details about when and where CRAWFORD and FEIGHT could meet to transfer possession of the remote initiation device from FEIGHT to CRAWFORD. Later on May 20, 2013, FEIGHT called CRAWFORD on Crawford Telephone #2. FEIGHT advised that he was at the "autoclaves" (located within GE's complex in Schenectady) and CRAWFORD advised he would be "right there."

172.) Upon information and belief, FEIGHT transferred the remote initiation device to CRAWFORD as CRAWFORD, at approximately 12:23 p.m. on May 20, 2013, sent a text message, via Crawford Telephone #2, to UCE #2 that said "Got prototype. Ill call you when I can meet." Later that evening, at approximately 6:29 p.m., CRAWFORD sent a text message to UCE #2, via Crawford Telephone #2, which said "Im here. We gota use em in the cars anyway so ill leave em down here." Your affiant believes that this text message regarded a meeting planned

---

[10] On or about April 2, 2013 and April 22, 2013, CRAWFORD delivered numerous components to the CHS, which appear to be all of the parts necessary to construct a remote initiation device for the X-ray system associated with the first branch of the investigation.

between CRAWFORD and UCE #2 that was to take place at a hotel in the Capital District wherein CRAWFORD and UCE #2 would test the remote initiation device for the second branch of the investigation.

173.) At approximately 6:30 p.m., on May 20, 2013, CRAWFORD met with UCE #2 at a hotel in Albany, New York. CRAWFORD drove to the meeting in his Saturn vehicle. CRAWFORD advised that he had the remote initiation device and that FEIGHT had provided him with information on how to hook the remote initiation device up to the radiation emitting device. CRAWFORD also told UCE #2 that the remote initiation device consisted of two units, and that they (CRAWFORD and UCE #2) would need to test the device by placing one unit in one car, and the other unit in the other car. The two would communicate with each other over their cell phones in order to determine when the units were in range, and out of range.

174.) During the meeting on May 20, 2013 between CRAWFORD and UCE #2, CRAWFORD and UCE #2 each took one radio unit into their respective vehicles and proceeded to test the range of the units. After about twenty minutes of testing it appeared that the units had a range of about 4/10ths of one mile, in other words, the units could be used to turn a device on and off remotely up to a distance of 4/10ths of a mile. After the successful testing of the remote initiation device, CRAWFORD advised UCE #2 that he had a "guy" (whose identity was not revealed by CRAWFORD and whose identity remains unknown to investigators) who could do some welding and fabrication of a pallet that could be used to house the radiation emitting device, allowing it to be easily moved from one truck to another. CRAWFORD then asked UCE #2 if he thought UCE #3 would be interested in joining forces with the other branch of activity (that involving the CHS and UCE #1). CRAWFORD then told UCE #2 "glad I met you guys" and "we are going to drive a stake through their heart."

175.) After the face-to-face meeting between CRAWFORD and UCE #2 concluded on May 20, 2013, CRAWFORD sent three text messages, via the Crawford Telephone, to a telephone number believed to be associated with person I. The gist of the text messages was that CRAWFORD was going to be in said person's

neighborhood later that evening, and CRAWFORD felt that he may have "an opportunity that interests you." Investigators are still uncertain if the person who received these text messages is the person CRAWFORD previously referenced as having welding capabilities.

176.) At 9:34 p.m., on May 20, 2013, CRAWFORD sent the following text message, to FEIGHT: "Contact me next chance we have to get face to face, I have excellent news. Youll be very pleased." Your affiant believes that this text message shows that CRAWFORD reported to FEIGHT the successful testing of the remote initiation device built by FEIGHT.

177.) On May 21, 2013, CRAWFORD, sent a text message to UCE #1 advising that the testing of the remote initiation device went well (pertaining to the second branch of the investigation) and that UCE #1, the CHS and CRAWFORD should all have a meeting.[11]

178.) On May 22, 2013, CRAWFORD spoke with the CHS. CRAWFORD advised the CHS that he/she should give CRAWFORD the parts for the remote initiation device previously provided, and that, presumably, CRAWFORD would be able to assemble the parts.

179.) On May 24, 2013 and May 29, 2013, CRAWFORD spoke with the CHS via the Crawford Telephone. During the calls, CRAWFORD and the CHS discussed when they could meet so that CRAWFORD could take possession of the parts for the remote initiation device in the first branch of the investigation. At approximately 3:10 p.m. on May 29, 2013, CRAWFORD met the CHS at the coffee shop. CRAWFORD drove to the meeting in his Saturn vehicle. During the meeting, the CHS gave CRAWFORD the parts CRAWFORD had previously procured for the CHS to make into a remote initiation device for the first branch of the investigation. During this same meeting, CRAWFORD informed the CHS that (i) a third party would be putting the remote initiation device together for the first branch of the investigation, (ii) that CRAWFORD would assist that third party as necessary, and (iii) they planned to finish construction of

---

[11] Beginning on about October 4, 2012 and continuing occasionally over time, CRAWFORD revealed to the CHS and UCE #1 that he was working with other like-minded individuals (UCE #2 and UCE #3) and that they (CRAWFORD, UCE #2 and UCE #3) were also attempting to construct a radiation emitting device that could be remotely turned on and off.

the remote initiation device over the weekend.  CRAWFORD did not identify the third party but described this person as discreet. Investigators are uncertain if this third party is FEIGHT or some other unidentified person.

180.) On June 5, 2013, the CHS telephonically contacted CRAWFORD and inquired about the status of the construction for the remote initiation device referenced below.  CRAWFORD advised that the "guy" has the parts, that the guy was working on the device, and that the project should be done soon.  Investigators still do not know the identity of the person referenced by CRAWFORD as the "guy".

181.) On June 12, 2013, UCE #2 called CRAWFORD on the Crawford Telephone.  The two discussed the status of their plan and when the parties could meet to have dinner and look at some equipment. CRAWFORD advised that June 17 and 18, 2013 would be days he could meet with UCE #2 and UCE #3. Based on this, and previous conversations, including April 9, 2013, I believe that CRAWFORD is aware that he will be provided, then assembling and testing the x-ray system, and will then connect the remote initiation device to the x-ray system's control panel. Subsequent communications between CRAWFORD and UCE #2 have established that CRAWFORD and UCE #2 and UCE #3 will meet at a location in the NDNY on June 18, 2013 wherein CRAWFORD will be given access to an x-ray system.  This meeting could begin as late as late afternoon on the 18th.

### CONCLUSION

182.) Based on the foregoing facts, there is probable cause to believe that GLENDON SCOTT CRAWFORD and ERIC J. FEIGHT have conspired to provide material support, or resources, intending that they be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 2332a (use of a weapon of mass destruction), from on or about April 2012 through June 2013, in violation of 18 U.S.C. § 2339A.

WHEREFORE, I respectfully request that the Court issue a complaint (and accompanying arrest warrants) charging GLENDON SCOTT CRAWFORD and ERIC J. FEIGHT with a violation of 18 U.S.C. § 2339A.

_____
Geoffrey Kent, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before

me this __17__ day of June 2013

_____

HON. CHRISTIAN F. HUMMEL

United States Magistrate Judge

66