UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    -against-

ERIC J. FEIGHT,

    Defendant.

**Docket No.: 1:14 cr-00012-GLS**
**Hon. Gary L. Sharpe**
**Chief U.S. District Judge**

---

**SENTENCING MEMORANDUM**

---

ANDERSON, MOSCHETTI & TAFFANY, PLLC
Attorneys for Defendant
26 Century Hill Drive, Suite 206
Latham, New York 12110
(518) 785-4900

Of Counsel
Peter J. Moschetti, Jr., Esq.

## Introduction

In the summer of 2012, Eric Feight was approached by Glendon Scott Crawford. He was asked to put together a remote control system for a group of investors that Crawford said had developed a mobile process utilizing radiation to sterilize medical waste for hospitals.

In the fall of 2012, Crawford revealed to Eric that the x-ray machine was intended to be used as a weapon against Muslim terrorist cells. Eric was very skeptical of the plan and the viability of the machine and felt it was just nonsense talk for which Crawford was known.

Later, Crawford requested that Feight meet with his "investors", who were to finance the project. Eric initially told Crawford he was not interested, but Crawford persisted and Eric foolishly agreed to go along with Crawford to the meeting in Scotia, New York. As the discovery and evidence demonstrate, although Crawford was not sophisticated in many ways, he was extremely successful at persuading people to do things for him.

Eric agreed to go to the meeting out of curiosity, thinking it would be just more talk about this far-fetched plan that made little sense and would never get off the ground. Unfortunately, agreeing to go was the biggest mistake of his life.

Once there, he realized that the two "investors" appeared not only sophisticated, but determined and serious about the plan. Eric immediately knew he had made a mistake and put himself and his family in danger.

Although in their presence he agreed to put together a simple remote control system, he spent more than six months ignoring them and delaying the process, hoping they would lose interest and leave him alone.

That did not happen and at the end of May of 2013, he gave Crawford a simple remote control system that Eric knew would not be compatible with any x-ray machine Crawford was able to obtain. Eric knew Crawford would not be able to hook it up to remotely control the machine.

Even before Eric gave Crawford the remote, he told Crawford he did not want to be part of the plan and would not work to try and integrate the remote control system to the machine.

When arrested on June 18, 2013, Eric cooperated completely with government agents and accepted responsibility for his conduct. On January 22, 2014, pursuant to a written plea agreement, Eric pleaded guilty to a one count information which charged him with Providing Material Support to Terrorists in violation of 18 U.S.C. §2339(A)(a). He also agreed to cooperate with the government should they decide they needed his help at Crawford's trial.

This husband and father of three girls had never in his life been in trouble. He has a reputation for kindness, compassion and charity. He has been incarcerated in local jails for almost two and one-half years waiting to be sentenced.

**Background and Character of Eric Feight**

Eric was born on October 14, 1958 and was adopted at birth by his maternal grandparents. By all accounts, he thrived under their guidance and care. He graduated from a Florida high school and earned his Associate's Degree in mathematics at Lake Sumter Community College. He completed almost two years at Florida State University as a mathematics major, but left school shortly before graduating.

He excelled at work and as can be seen in the numerous character letters submitted on his behalf, he developed a reputation for having an extremely strong work ethic and being an outstanding employee. He worked as a project engineer for Smith Control Solutions for approximately 14 years. He then worked as an automation engineer at Cobleskill Stone Products in Cobleskill, New York for three years, until his arrest in June of 2013. He was terminated due to his extended incarceration. Also, in 2011, he and a partner started a business, which employed three individuals.

He married his wife Connie in 1983. They have three children; Elizabeth, who is age 26, resides in Germany and serves in the U.S. Air Force; Rachel, who is 23, resides in New Hampshire, is engaged to be married and is employed as a technician for CVS; Emily, who is 18, and although historically a very good student, since her father's arrest has dropped out of high school and moved out of her parents' house.

As indicated in his children's letters, Eric was a hands-on father who has always been there for them. They describe him as a tremendously positive influence on their

3

lives. He was heavily involved in their schooling, helping them with their homework on a daily basis, and doing things like chaperoning for the ski club. Because of Connie's health issues, he cooked dinner for them on most nights. He always tried to teach them the right way to act by being an excellent role model.

As the letters indicate, Eric has devoted himself to charitable work most of his life. He volunteered his time as an adult supervisor for the Boy Scouts and Webelos. He is a long-time member of the Kinderhook Elks Lodge, where he has performed countless hours of community service.

In her letter to the Court, Emily relates that her father was involved in charitable work through the Elks and would frequently distribute food to the disadvantaged. For years, he has delivered food and presents during the Christmas holidays to families in need. He has raised money for students needing funds for tuition assistance and has been described as unselfishly giving of his time and talent to help the communities of the underprivileged.

Emily states that her father taught her to treat everyone equally, no matter who they were or what they looked like.

Rachel describes her father as the most honest and kind-hearted person she has ever known, who taught her to have compassion for others and never displayed violent or hateful tendencies. "I have always aspired to be as charitable and respectful as my father."

Consistent throughout the letters submitted is that Eric never displayed violent or hateful tendencies or aggression towards anyone or anything. He is known for his kindness and compassion.

Eric has never been a member of any right wing or radical group. He and Connie have never owned a gun. After his arrest, the government searched Eric's home and workshop and went through all of his computers. There was not one piece of evidence to indicate he was a member of or involved in any radical groups or organizations.

He never knew until after his arrest that Crawford was a member of the "KKK" and was not told by Crawford that his "investors" were also associated with the Klan until months after the November 2012 meeting at the Scotia diner. Crawford revealed that to Eric after Eric had repeatedly delayed supplying the remote control system and told Crawford he didn't want to be involved. In telling Eric this, Crawford stressed that these individuals were not to be "messed with".

If Eric Feight had been a zealot and a true believer like Crawford, he would have provided the remote control system to Crawford right away and made sure that it would interface with and could be connected to the x-ray machine. He did just the opposite.

One of the letters submitted to the Court describes Eric as kind and compassionate, but also the most naive individual the person has ever met. This trait may explain how a person like Eric Feight, with his strong character and background, got into such a mess and had such a hard time getting out of it.

5

**Eric's Minor Role and Attempt to Leave the Conspiracy**

As indicated, Crawford initially convinced Eric that he was trying to develop a system that could sterilize medical waste through radiation. As this Court knows from presiding over Crawford's case, he was rarely truthful with anyone and convinced many to help him (individuals "A", "B", "C", "D" and others).

Crawford tried to convince a Capital District synagogue and another Jewish organization to help him with financial support so he could design and produce a device that could be used to disrupt, injure and kill Muslim terrorist cells in the U.S. In fact, from the discovery produced, it appears he attempted to pitch this idea to United States Congressman Chris Gibson.

Although there is a great deal of evidence that Crawford wanted to use the device against government officials and others he found undesirable, he never indicated that to Eric and was careful to keep it from him.

In all of the discovery supplied by the government, including text messages, e-mails, telephone calls, wiretap recordings and taped encounters, there is not one instance where Crawford or the undercover agents indicate who their real intended targets were. All that was told to Eric was that the device would be used solely against Muslim terrorist cells in the United States. Crawford kept his real intentions secret from Eric, just as he did with respect to his membership in the Klan and his trips down south. He hid the alleged membership of his "investors" in the Klan until he realized Eric was backing out

of the plan. It was then that Crawford told Eric they were members of the KKK and that he did not want to get on the bad side of these individuals by backing out.

At the time Eric agreed to go to the November meeting at the diner in Scotia, he was not taking Crawford seriously and believed Crawford's idea about the x-ray machine would never work. He thought Crawford seemed a little crazy, but harmless.

After meeting the two undercover agents posing as investors, he was left with the impression they were anything but harmless and appeared deadly serious. While at the initial meeting, he started to panic and realized that now he knew who they were and knew some of their plan, they were not going to let him back out and he had now placed himself and his family in grave danger.

As further evidence of Eric's fear, after his arrest on June 18, 2013, he was questioned by Detective Naffi of the task force. During the questioning, Eric asked if the detective would give his cell phone number to Connie and instruct her to call Naffi and 911 if she was approached by the guys involved with Crawford. Eric feared if they knew he had been arrested, they might do something to his family to keep him from cooperating with the government.

Detective Naffi allowed Eric to call Connie to warn her and give Connie Naffi's number. Later, Naffi revealed to Eric that the two individuals involved with Crawford were undercover agents. He then let Eric call Connie and tell her so she would not worry.

Eric has even related that he thought about going to the authorities himself and revealing the group's plan, but he feared the group would strike out against his family. Afterwards, he realized he should have gone to the authorities and tragically made the wrong decision.

What he did do was delay completing the remote control system with the hope that Crawford and the others would become discouraged and leave him and his family out of it.

The evidence demonstrates that Eric's role in Crawford's plan was actually quite minor. The remote control system was non-essential to the x-ray device's operation. In the government's response to Crawford's motions (¶9), it indicates that the remote control system was "not functionally necessary" to the operation of the x-ray device nor the theoretical success of the plan.

The plan did not originate with Eric and he had no real knowledge of radiation and x-ray devices. The only time he met the "investors" was at the Scotia Diner. He avoided contact with them and he was kept out of the loop as to what they and Crawford were doing.

As the government concedes, the remote control system that Eric was asked to design should have taken less than one week or two to put together. Yet Eric did not turn over to Crawford this simple device for more than six months. This demonstrates Eric's purposeful attempt to avoid providing the device.

8

Discovery provided by the government shows that Eric avoided calls and text messages from Crawford and the undercover agents. He made up excuses, such as his phone was not properly charged and he was not getting the messages and he had work obligations that kept him from responding.

In November of 2012, one of the undercover agents requested that Eric send him a diagram of the remote control system. The diagram Eric forwarded to him contained no details and was merely a crude block diagram of no value. It was provided solely to try to placate them.

In December of 2012, the agent sent an e-mail to Eric requesting a meeting. Eric never went to the meeting and in fact never responded to the e-mail.

On January 28, 2013, the undercover agents, frustrated by the delay, expressed to Crawford that they thought it would have taken two to three weeks for Eric to complete the remote control system. Crawford indicated he thought it would have been "inside of one week".

To create further delays, Eric informed Crawford that the remote device needed lights, although it already had lights. There actually was no need for them and it was just a delaying tactic. Eric did the same when he told Crawford that he needed cord grips for the device. This again was just another delaying tactic, as there was absolutely no need for the grips.

In January of 2013, Crawford wanted Eric to meet up with him and the two agents at a restaurant near Albany. Eric refused to go.

9

Discovery provided by the government is replete with text messages, e-mails and tape recordings wherein Crawford expresses his displeasure about Eric to the undercover agents. He stated he was "shocked about the delays" and wanted to replace Eric.

Numerous times when he communicated with the undercover agents, Crawford indicated he was sick and tired of waiting. By February of 2013, Crawford was actively trying to recruit a replacement for Eric, although the undercover agents tried to discourage him.

In March of 2013, Crawford wanted Eric to meet up with the agents to show them what progress had been made with the remote. Eric refused. In fact, he made up a claim that there were missing parts to the radios, further delaying the process.

At several meetings at a Chinese restaurant in Scotia, New York, Crawford warned Eric that the investors were unhappy with Eric and it would be "a mistake to mess with them". It was also at one of those meetings that Crawford informed Eric that the two were members of the "KKK".

At the end of February of 2013, Eric requested additional parts, including a "second enclosure and back panels". Of course, these were totally unnecessary and were not used by Eric.

In May of 2013, Crawford sent a text to one of the agents, telling him he was grooming an alternate source to replace Feight and build a remote control system.

On May 8, 2013, Crawford wanted Eric to demonstrate the device to the two undercover agents. Eric refused.

When the agents asked what was happening with Eric, Crawford told them Feight was "out" of the picture.

### Eric Gives Crawford a Useless Remote System

On May 20, 2013, Eric gave Crawford a remote control system that was not capable of remotely starting the x-ray machine. It was essentially useless. Most importantly, Eric had made it clear to Crawford that he would not be involved in any way in trying to integrate the remote control system to the x-ray device. He also made it clear he would not attend the testing of the x-ray device, that he was finished and would have no further involvement with Crawford and the others.

Even the government agents knew that delivery of the remote control system alone would be of no value to operating the x-ray device remotely. During the November meeting at the Scotia diner, one of the agents stated what they needed was not just a remote control device, but someone to integrate the system into the controls for the x-ray machine.

The remote control device given to Crawford was simply designed to turn on a 120 vac relay. The test of the system conducted on May 20, 2013 just verified the radios could communicate with each other, not that it could turn on the x-ray machine.

On page "9" of the government's response to Crawford's pre-trial omnibus motion, it states that "the x-ray device was built by the manufacturer without any such

11

remote control component, as made clear in the device's manual". The x-ray device was not designed for use with a remote control system. The integration of such a system would therefore require an extensive amount of modification to both the remote control system and x-ray machine itself.

In order for a remote control system to function properly, it must be designed and built to be compatible to the specific device that it is supposed to control. As an example, a television remote cannot be used to open a garage door and a remote car starter will not turn on a television.

In order for any device to be remotely controlled, the remote system must be specifically designed to control that device. Additionally, and more importantly, the device must have the ability to be remotely controlled. That was not the case with respect to the x-ray device in this case. If the device had remote control capabilities, it would have been a simple matter of purchasing the x-ray machine with the manufacturer supplied remote control.

During the meeting at the Scotia diner, the undercover agents stated they did not have access to anyone with the capability to modify the controls for the x-ray device so that it could be operated by a remote control system.

Without detailed technical documentation, including, but not limited to, an electrical schematic for the control panel of the x-ray machine, it would be impossible to determine what type of remote control device would be needed. Thus, the remote control

system that Eric provided to Crawford was essentially useless and could not remotely start the x-ray device.

This is confirmed by the videotape of Crawford's arrest at the warehouse on June 18, 2013. The video captures Crawford expressing to the undercover agents that he was afraid to operate the x-ray machine when he was so close to it in the warehouse as he feared radiation exposure.

If the remote control system was properly designed, all Crawford had to do was attach it to the x-ray machine and turn the machine on remotely from outside the building. Of course, this was not done because it was impossible to do.

It is important to remember that this remote control system is what Crawford and the agents waited six months for. With Eric refusing to be further involved with Crawford and the others there was no way for them to even begin to try and interface the device Eric gave them.

Eric knew when he gave the system to Crawford that it was useless. He felt giving them the generic remote control system would demonstrate sufficient functionality to satisfy the group that he had made an effort to fulfill his part of the plan. Eric thought this would afford him the opportunity to terminate his involvement with them without endangering his family.

**Eric's Conduct Since His Arrest**

Upon his arrest in June of 2013, Eric fully cooperated with the government. He answered all questions of detectives Wells and Naffi and helped them relay information to agents in the field to assist them in their executing the search warrants that had been issued. Both Wells and Naffi stated in the videotaped questioning of Eric that they believed he was completely and fully honest with them and that his cooperation had assisted them and they would let the U.S. Attorney's office know that.

Since June 18, 2013, Eric has been incarcerated in local jails, being moved frequently between Rensselaer, Washington and Warren counties. As there was the potential for the need for him to cooperate in Crawford's trial, his sentencing was adjourned until after the trial.

While in jail for almost two and one-half years, Eric did not just sit around and do nothing. He established bible studies for inmates in Rensselaer and Warren counties. He also taught an industrial automation class and tutored a large number of inmates in math. His conduct while incarcerated has been exemplary.

## Sentencing Guideline Calculations

The defense does have objections to the guideline calculations as set forth in the presentence report.

The defense does agree that the base offense level for a violation under 18 U.S.C. §2339(A)(a) is 28. As part of the plea agreement, defendant has agreed not to challenge the three-level increase for victim-related adjustment pursuant to §3(A)1.1(a). The same is true for the two-level increase for role in the offense, using a special skill. (§3(B)1.3).

This results in an offense level of 33. There should be a two-level reduction for acceptance of responsibility pursuant to §3(E)1.1(a) and a one-point reduction for acceptance of responsibility under §3(E)1.1(b).

The total offense level would be 30. With Eric's total criminal history score of 0, establishing a criminal history category of I, the imprisonment range is 97 to 121 months. The maximum term of imprisonment for a plea to 18 U.S.C. §2339(A)(a) is 15 years.

It is the defendant's position that the pre-sentence report improperly increases the offense level by 12 pursuant to U.S.S.G. §3(A)1.4(a).

Section 3(A)1.4 requires proof of two elements: (1) the defendant must have been convicted of an offense that involved or tended to promote a federal crime of terrorism; and (2) the offense must have been calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

It is conceded that as a result of the defendant's plea to 18 U.S.C. §2329(A), the first requirement has been met. However, it is defendant's position that the second prong requiring that the offense must have been calculated to influence or affect the conduct of the government by intimidation or coercion, or retaliation against government conduct, has not been met.

In United States v. Awan, 607 F.3d 306 (2nd Circuit 2010), the Court specifically held that the "calculation element of a federal crime of terrorism requires proof that the defendant possessed the specific intent . . . to commit an offense that was calculated to influence government conduct."

Eric was repeatedly told by Crawford that the purpose of the x-ray machine was to use it against Muslim terrorist cells. Eric was not involved in any discussions with Crawford and/or the undercover agents about specific targets other than Muslim terrorist cells. There is no question Crawford kept secret from Eric his true intent with respect to the use of the device in order to try and keep him interested and involved. From Eric's perspective and from what he was told, it was not his intent to influence or affect the conduct of government. Therefore, the application of §3(A)1.4(a) and the 12-level increase and the increase of the criminal history to category VI is not applicable in this case.

## Sentencing 18 U.S.C. §3553(A) Analysis

Federal criminal sentences should be "sufficient, but not greater than necessary". 18 U.S.C. §3553(A). They should fit the crime, provide for "adequate deterrence", "protect the public" and "promote rehabilitation". 18 U.S.C. §3553(A)(2).

Since the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005) and Kimbrough v. United States, 52 U.S. 85 (2007), Federal Courts again have great discretion, within certain limits, to decide appropriate federal sentences.

Under 18 U.S.C. §3553(A) (a), the Court is required to consider a number of factors prior to sentencing an individual, including the nature and circumstance of the offense, the seriousness of the offense, the history and characteristics of the defendant, the need for just punishment and deterrence and protection of the public from further crimes of the defendant.

There is no question this was a serious matter. However, all the evidence in the case demonstrates that Eric played a minor role and tried to distance himself from the plan right from the beginning. As set forth herein above, he delayed for six months the completion of a simple remote control system. When he did finally give Crawford the system, Eric knew it would be essentially useless to Crawford and the group and could not be used to activate the x-ray machine.

It should also be remembered that Eric believed it was unlikely the x-ray machine itself could do what Crawford wanted it to do.

17

Most importantly, Eric walked away from this conspiracy, telling Crawford he did not want anything to do with the group and would not assist in any way in trying to integrate the remote control system with the x-ray machine. Unfortunately, what he should have additionally done was to report Crawford and the others to law enforcement. He will regret not doing that for the rest of his life.

He did fully cooperate with the government at the time of his arrest and committed to cooperating with them during the pendency of both his and Crawford's case. His conduct while incarcerated for the last two and one-half years has been exemplary.

His background and conduct prior to this incident and his subsequent actions demonstrates his involvement with Crawford was an aberration.

He is not a zealot or an extremist. All the evidence leads to the contrary. He is known as a kind, compassionate, hard-working individual who was actively and intimately involved in the raising of his children. He has been an outstanding husband and he has excelled in every work endeavor that he has undertaken.

He has been wrongly portrayed in the press as being just as deeply involved in this matter as Crawford. The evidence establishes that is the furthest thing from the truth.

He has taken time while in jail, as best he could, to rehabilitate himself. He does not represent a threat to society and if freed, has the support of his family and community so that he can again be an asset to society.

## Conclusion

Based on the foregoing, it is respectfully requested that the Court sentence Eric Feight to no more than 36 months of incarceration.

DATED:     November 23, 2015

Respectfully yours,

_____
ANDERSON, MOSCHETTI & TAFFANY, PLLC
By:    Peter J. Moschetti, Jr., Esq.
Bar Roll No.:  102226
Attorneys for Defendant
26 Century Hill Drive, Suite 206
Latham, New York  12110
(518) 785-4900