1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF NEW YORK

3

4   UNITED STATES OF AMERICA,          )
                                       )
5                                      )    CASE NO.: 14-CR-12
                                       )
6         VS.                          )
                                       )
7   ERIC J. FEIGHT,                    )
                      Defendant.       )
8   _____)

9

10                  **TRANSCRIPT OF PROCEEDINGS**
              **BEFORE THE HONORABLE GARY L. SHARPE**
11               **WEDNESDAY, DECEMBER 16, 2015**
                     **ALBANY, NEW YORK**

12

13  **FOR THE GOVERNMENT:**
          Office of the United States Attorney
14        By:  Stephen C. Green, AUSA, & Richard D. Belliss, AUSA
          445 Broadway, Room 214
15        Albany, New York  12207

16

17  **FOR THE DEFENDANT:**
          Anderson, Moschetti & Taffany, PLLC
18        By:  Peter J. Moschetti, Esq.
          26 Century Hill Drive, Suite 206
19        Latham, New York  12110

20

21

22

23              **THERESA J. CASAL, RPR, CRR, CSR**
                 Federal Official Court Reporter
24                  445 Broadway, Room 509
                    Albany, New York  12207
25

                  *THERESA J. CASAL, RPR, CRR*
             *UNITED STATES DISTRICT COURT – NDNY*

*USA v. Feight — 14-CR-12*

1              (Court commenced at 9:01 AM.)

2              THE CLERK:  The date is Wednesday, December 16,

3     2015, at 9:00 AM.  In the matter of the United States of

4     America versus Eric J. Feight, case number 14-CR-12.  We are

5     here for sentencing.  Appearances for the record, please.

6              MR. GREEN:  For the United States, Assistant

7     United States Attorney Stephen Green and Richard Belliss,

8     your Honor.

9              THE COURT:  Good morning.

10             MR. MOSCHETTI:  Pete Moschetti on behalf of

11    Mr. Feight.  Good morning, Judge.

12             THE COURT:  Good morning.  Good morning,

13    Mr. Feight.

14             THE DEFENDANT:  Good morning.

15             THE COURT:  All right.  We're here for purposes of

16    sentencing.  The Court has received and reviewed the

17    sentencing submissions of the parties, has received and

18    reviewed the presentence report and has shared with the

19    parties the Court Exhibit, which, for my purposes, is a

20    summary of the Guideline findings that are contained in the

21    presentence report.  In addition, it contains one special

22    condition of supervised release that is recommended to me,

23    which I will incorporate in the judgment, and since I've

24    supplied it in writing, I see no need to read it.

25             As the Circuit sets out, the way in which we need

*USA v. Feight - 14-CR-12*

1   to proceed is to establish whether there are factual

2   objections to the presentence report, whether there are

3   objections to the scoring of the Guidelines, which I know

4   there are, and then whether or not the appropriate sentence

5   is a guideline sentence or some sentence involving a

6   variance.

7           Let me ask at the outset before I get to the

8   facts, the Government indicates in its sentencing submission

9   that the maximum term of supervised release is life.  The

10  presentence report and the Court Exhibit reflect that this

11  is a range of one to three years.  What's the Government say

12  about that?

13          MR. GREEN:  Your Honor, initially, we had the

14  position that the range was to a maximum of life, but we

15  adopt the finding in the presentence report.

16          THE COURT:  Okay, thank you.  All right.  Let's

17  turn then to whether there are any factual objections to the

18  presentence report.  Government have any?

19          MR. GREEN:  Not from the Government, your Honor.

20          THE COURT:  Mr. Moschetti, does the defendant have

21  any?

22          MR. MOSCHETTI:  Judge, as you know, there's that

23  18-page addendum to the sentencing report that Probation has

24  put in.  We worked on this, as you know, a number of times,

25  I think there were two amendments to the presentence report.

*USA v. Feight - 14-CR-12*

1    They put my objections in there, which were both objections

2    to some of the factual statements, but also an explanation

3    or maybe a counter explanation of how you would interpret

4    what was placed in there.  I think the biggest objection

5    from me was that I thought there was an overwhelming amount

6    of information concerning Crawford and I understand that

7    because of the nature of the conspiracy charge and the proof

8    there would certainly have to be references to Crawford and

9    his conduct, but when you look at it, it's almost 95 percent

10   Crawford.  I mean, there's many things in there I don't

11   think anyone is gonna dispute Eric Feight knew nothing

12   about, things that were going on in North Carolina, things

13   that were going on between Crawford and the undercover

14   agents that he had no idea about, before he was even brought

15   in and during that period.  So, as an attorney, when I'm

16   looking at that that was my concern.  I thought if you look

17   at that without really looking at it, it's just almost

18   overwhelming, so we tried to take the time to address those

19   paragraphs where we thought it was important that the Court

20   see it maybe in a different light.  So that's really my

21   objection.  I wouldn't go paragraph by paragraph, as I said

22   there are 18 pages, they were kind enough to add those to

23   the report, which I hope was helpful to the Court.  But

24   that's my real factual objection.

25            THE COURT:  Well, let me say, I don't think

1    there's any need to resolve any of those issues.  I think

2    they're amply covered by the addendum, your sentencing

3    submission, which I read, and, of course, I understand the

4    underlying facts here because I heard the trial insofar as

5    Mr. Crawford was concerned.  So, I'm aware of the

6    distinctions between the conduct of the two and the issues

7    that are before me, so I don't think there's anything there

8    that needs resolution in order for me to pass sentence.

9         That does lead us, however, to the Sentencing

10   Guidelines, and I know there is an argument there about the

11   application of 3A1.4, the terrorism enhancement, and in

12   particular application note 4 and the impact of the

13   Circuit's decision in *Awan*, 607 Fed 3d 306, 2010.  What do

14   the -- and of course, that has a significant impact on the

15   guideline scoring here.  Absent 3A1.4, this is a level 30,

16   criminal history category I, with an advisory range of 97 to

17   121 months.  With the enhancement, it becomes a 42, criminal

18   history category VI, with an advisory guideline range of 360

19   months to life.

20        What -- let me begin with the Government as to

21   whether they wish to address anything further as to the

22   argument about the application of the enhancement that's

23   contained in the presentence report.

24        MR. GREEN:  Yes, your Honor.  If I may, if I might

25   address that and clear the record from the Government's

*USA v. Feight - 14-CR-12*

1  position.  3A1.4 provides for the application of that

2  enhancement in two different sets of circumstances:  Where

3  the conduct, the offense conduct involves a federal crime of

4  terrorism, and where the offense conduct is intended to

5  promote a federal crime of terrorism.  The Government's

6  position is both those prongs apply to the offense conduct

7  in this case.  The offense conduct invokes the "involved in"

8  prong of the enhancement because the conduct here was a plot

9  to kill or injure innocent human targets with a radiation

10  device, and the specific intent of the two defendants was to

11  commit an enumerated terrorism offense.  2232b(b)(g)(5)

12  lists a number of offenses that qualify as terrorism

13  offenses for purposes of that enhancement, and the first two

14  of the offenses which Mr. Crawford has been convicted of and

15  the offense that Mr. Feight has pled guilty to involve

16  conduct that was specifically intended to commit a terrorism

17  offense -- in this case, providing material support to

18  terrorists.  Secondly, the "intended to promote" prong

19  involves offense conduct where the intent was to assist or

20  enable or further the conduct of, in this case, another

21  person in carrying out an enumerated terrorism offense.

22       Here, Mr. Feight has pled guilty to an offense

23  that involves providing material support to terrorism and

24  that's precisely what he did in aiding Mr. Crawford in his

25  plot to obtain and then modify a radiation emitting device

*USA v. Feight - 14-CR-12*

1  that was intended, with his knowledge and awareness from his

2  early involvement, to be directed at and to target specific

3  individuals, including specifically Muslims.

4          On that basis, we believe both prongs of the

5  enhancement apply and that it should be applied here

6  resulting in the Guidelines that are referenced and the

7  Court just found.

8          THE COURT:  Thank you.  Mr. Moschetti.

9          MR. MOSCHETTI:  Yes, sir.  With respect to

10  3A1.4(a), I laid this out in my report, I think you saw

11  it --

12          THE COURT:  I have.

13          MR. MOSCHETTI:  -- there are two components:  One

14  is convicted of an offense that involved or was intended to

15  promote a federal crime of terrorism.  We concede that by

16  the plea.  I think the second prong, as I read *U.S. verses*

17  *Awan*, is it must be calculated to influence or affect the

18  conduct of government by intimidation, coercion or

19  retaliation against government conduct.  That's how I read

20  the case.  I think that's how it was laid out in the

21  presentence report and I think when you look at that, from

22  this defendant's perspective, that was not the intent, that

23  was not his intent, and there's nothing in the record of all

24  the material that we were provided, and it was a great deal

25  of material pertaining to Eric Feight and to Crawford that

1    indicates that it was Eric's Feight intent that somehow this

2    was going to affect or was trying to intimidate or coerce or

3    somehow adversely affect government conduct.  There was no

4    such nexus between his intent and the intent of what he

5    believed was being done and that aspect, and, therefore, I

6    don't see how that applies.

7            When you apply it, of course, it's so far off the

8    charts from the statutory 15 years and the level 30 analysis

9    that I believe is the correct analysis.  So, in this case, I

10   think there's an absence of the second prong that

11   requires -- that *Awan* requires, indicating that the intent

12   was to affect government conduct.  I know that the

13   Government talks about and puts forth some of the

14   discussions in the diner, but when you start to dissect what

15   happened, there's no mention during that period of time --

16   and I speak to that -- of any discussion about any targets,

17   and that looms rather large for us, I think.  But that being

18   said, I think clearly, in light of the fact there's no such

19   evidence of an intent to influence government conduct, that

20   it is not applicable and we should be at level 30.

21           THE COURT:  Thank you.

22           MR. GREEN:  May I, just briefly, your Honor?  Our

23   position is that Mr. Feight's own words evidence an intent

24   to retaliate against government policies with which he and

25   Mr. Crawford disagreed.  Some of those statements are

*USA v. Feight - 14-CR-12*

```
 1   included in paragraph 5 of Mr. Feight's plea agreement and
 2   that conduct and those statements are summarized in the
 3   presentence report, paragraph 208.
 4           THE COURT:  Well, I've reviewed these arguments,
 5   they're set out in detail in the parties' submissions and,
 6   of course, the resolution of those arguments is reflected in
 7   the scoring by Probation in the presentence report.  I agree
 8   with Probation, I agree with the Government that the
 9   circumstantial conclusions, both from a conspiratorial
10   standpoint and otherwise, are sufficient to support the
11   application and, therefore, I believe under Awan this is
12   correctly scored, which elevates the conduct to a level 42,
13   criminal history category VI, with an advisory Guideline
14   range of 360 months to life.  So I resolve that legal issue
15   in favor of the presentence report and the Government.
16           That leads us, then, to the third area, which is
17   whether or not -- and these are the same arguments that
18   apply here and this is the most cogent place, in my view,
19   for the discussion -- as to whether or not the advisory
20   Guideline range is the appropriate sentence here or whether
21   some variance from that is required.
22           The way in which I intend to proceed on this
23   issue is I want to hear from the Government, I'll then give
24   Mr. Moschetti an opportunity to be heard and then, of
25   course, Mr. Feight has the last word.
```

*USA v. Feight - 14-CR-12*

1        From the Government, I want to hear what the

2   Government's view is of the view of the evidence reflected

3   in the defendant's sentencing submission and in the

4   presentence report, and I also want to hear from the

5   Government, to the extent it's able to, what the agents'

6   view is of the underlying evidence in light of the fact that

7   they're the ones that spent the time with Mr. Feight and had

8   the conversations with him.

9        This is a bizarre case, bizarre.  It's been

10  bizarre from beginning to end.  That doesn't detract from

11  the fact that under the Guidelines, this kind of conduct

12  generically is scored right where it belongs.  When you're

13  targeting a particular group, regardless of who it is, with

14  a weapon of mass destruction intending to kill 'em, it calls

15  for enhanced, heightened penalties, and I don't have any

16  problem with the way in which the Guidelines are scored.

17  But I want to know what the Government's view is about this

18  defendant's specific conduct in that connection because

19  that's the issue that's before me.  Is a variance warranted

20  here or not?  Go ahead.

21        MR. GREEN:  Your Honor, as the Court has just

22  noted, the conduct of Mr. Feight and the conduct of the

23  other defendant, Mr. Crawford, are certainly disparate and

24  distinguishable.  Mr. Feight's role was having been

25  recruited by Mr. Crawford to assist Mr. Crawford, not in

1    acquiring the device, but in modifying the device so that it

2    would be more useable for a number of reasons by the

3    defendant and anyone else who would use it.  Specifically,

4    Mr. Feight acknowledges in his plea agreement, in

5    paragraph 5, that his role was to listen to the plans and

6    learn about the device, the X-ray radiation emitting device

7    that the defendants planned to acquire, to understand how it

8    worked and then to use his special skills and expertise in

9    industrial automation to design, build and deliver to

10   Mr. Crawford a working remote initiation device that would

11   allow the X-ray radiation system to be operated from a

12   distance.  To Mr. Crawford's view and in discussions in

13   which Mr. Feight participated, that device, that remote

14   initiation device that he was specifically tasked and

15   accepted the challenge to do, the purpose of that device was

16   two-fold:  One, it would allow the operators of the device

17   to turn it on and turn it off from a distance and, thus,

18   avoiding danger to themselves by any scatter of radiation

19   that perhaps would be occurring when they turned the device

20   on in a location or in a van, as they discussed using, where

21   they were not protected or shielded from any scatter of

22   radiation or any other radiation emitted by the device.

23          The second purpose for that device, as understood

24   by Mr. Feight and acknowledged in his conversations with

25   Mr. Crawford and the undercovers on the November 14th

*USA v. Feight - 14-CR-12*

```
 1   meeting at the coffee shop, was to allow them some
 2   separation.  If the Court recalls that exhibit from the
 3   Crawford trial and again from the parties' submissions in
 4   Mr. Feight's case here, the discussion from the very
 5   outset at that November 14, 2012, meeting, particularly on
 6   Mr. Feight's part, was to avoid detection, to distance
 7   himself from the actual operations, in his words, to provide
 8   plausible deniability.  That conversation, the initial parts
 9   of it, go at great length in describing how they can be
10   removed from it, how they cannot have their fingerprints on
11   it, how they cannot necessarily be next to the device if
12   discovered by law enforcement.  So for the protection of
13   individual safety, enabling the device to be used repeatedly
14   and safely by the operators and also to remove themselves
15   from the danger of being caught by the police or detection
16   of what they were doing, that device was, in Mr. Crawford's
17   view and shared by Mr. Feight in those conversations, an
18   important component to modify the radiation unit so it could
19   be used in that fashion to target unsuspecting, innocent
20   human beings.
21            Mr. Feight was told what the task was, he
22   explains, as he acknowledges in paragraph 5 of his plea
23   agreement, that the whole purpose was to target people who
24   they found to be undesirable.  He says in his -- paragraph 5
25   of his plea agreement he understood that to mean Muslims.
```

*USA v. Feight - 14-CR-12*

1   And rather than reject the offer, as other people had

2   rejected Mr. Crawford's solicitations, Mr. Feight accepted

3   it, accepted that solicitation.  He not only accepted it, he

4   had an extensive discussion, most of which is laid out in

5   that November 14th meeting, where he talks about the various

6   ways to do it, about how he can be removed from it by not

7   necessarily participating directly in the obtaining of the

8   parts to do it, and then discusses various ways in which the

9   device could be built and designed.  And at the end of that,

10  at the end of that discussion, he proposes how he would

11  suggest to do it, provides a cost estimate for exactly how

12  it would be put together and what those parts would cost him

13  to buy, and then proposes a plan about how to put it

14  together.  During that meeting, he was shown an operations'

15  manual for the device provided by the participants, he

16  examined it, he described the technology as old, perhaps

17  from the 1950s, old military style, and said that it would

18  not be difficult to integrate his intended remote control

19  unit to the control panel of the device.

20          So, in Mr. Crawford's view, it was an important

21  and essential part of the X-ray device that he would intend

22  to use both to keep himself safe and also to allow the

23  parties to avoid detection by law enforcement.  So, the

24  agents' view, and I think the prosecutors share the view,

25  that Mr. Feight's role, he was certainly free to turn it

*USA v. Feight - 14-CR-12*

```
 1  down, he was certainly free to say I don't think I want to
 2  do this, but he didn't do that, he accepted the task.  And
 3  not only that, he commented that the use of a radiation
 4  device to accomplish this task of killing unsuspecting
 5  targets, specifically Muslims, was very smart because there
 6  would not be an immediate sensation by the victim, there
 7  would be no sound, there would be no blood, there would be
 8  no immediate medical effects, but they would linger and that
 9  would occur sometime later.  He described the plan as being
10  very smart and he described his ability to design, build and
11  deliver to Mr. Crawford a working remote initiation unit as
12  easy and something that he could do.
13          At the end of that meeting, Mr. Feight doesn't go
14  to law enforcement, Mr. Feight doesn't go home and then call
15  back and say I really don't know if I want to do this, he
16  doesn't withdraw.  To the contrary.  They discuss going to
17  have shots and beers at a bar down the street with these
18  individuals who he now claims in his sentencing memo he was
19  terrified of and thought threatened his security and    his
20  family security.  They went down the street, had shots of
21  Jamesons, had beers, Guinesses, and these people who   Mr.
22  Feight claimed to be afraid of, he divulged to them his
23  cellphone number, his e-mail address, he discussed his wife
24  and his three daughters, he discussed his residences, his
25  employment history, his company, and joked with them about
```

1    several topics.  But, then, again, in parting, agreed to

2    toast to this organization of theirs, the conspiracy, which

3    they referred to as "the guild" and then went about, over

4    the succeeding weeks and months, providing Mr. Crawford with

5    parts lists of things he needed to build the remote device,

6    he would get them, have conversations with Mr. Crawford, I

7    think these are all set out, many of them, in the

8    presentence report and the complaint and Court has seen

9    them, and went on to, over the course of those following

10   months, build this device, test it, deliver it to

11   Mr. Crawford, telling him that it was a working device

12   and twice provided specific instructions to Mr. Crawford

13   on how Mr. Crawford could then take the remote units that

14   Mr. Feight had designed and built and integrate them into

15   the control panel of the radiation device and how that would

16   then enable the device to be used as Mr. Crawford intended,

17   from a distance up to a quarter of a mile, and he

18   represented to Mr. Crawford and to the undercovers that the

19   device he delivered would be operational.

20          The -- it is true and the Government acknowledges

21   in its sentencing memorandum that almost immediately upon

22   his arrest, Mr. Feight agreed to be interviewed by law

23   enforcement.  He sat down with two members of law

24   enforcement and in law enforcement's view and in our view

25   was, in most respects, candid about his role and his

 1   activities.  He discussed his work with Mr. Crawford in

 2   designing and building the device.  He discussed and

 3   admitted his knowledge of what the device, the radiation

 4   device was intended to do.  He discussed his understanding

 5   of what the remote device -- what its purpose was and what

 6   advantages it provided in modifying the radiation device.

 7   Sometime later, actually on January 22nd of 2014, he signed

 8   a written plea agreement, and a hearing in this courtroom in

 9   front of your honor, he sat here and told you that he

10   acknowledged as true every factual statement set forth in

11   paragraph 5 of that plea agreement and admitted each of them

12   to this Court.  And based on that, his prompt decision to be

13   candid and be interviewed by law enforcement, his offer to

14   cooperate with the Government, and our assessment of his,

15   for the most part, candor in providing information to the

16   Government, Mr. Feight was offered the opportunity to plead

17   to an offense substantially different from those with which

18   Mr. Crawford was ultimately charged.

19           THE COURT:  I concur with that.  But is it

20   substantially different in terms of the Guideline score that

21   flows from that?

22           MR. GREEN:  Well, in terms of the Guideline score,

23   no, your Honor, but the offer was made with the awareness

24   that the statute to which Mr. Feight was offered the

25   opportunity to plead guilty carries a statutory cap that

1   makes a fundamental difference and does substantially alter

2   what the Guideline sentence ordinarily and otherwise would

3   be.

4            THE COURT:  Um-hum.

5            MR. GREEN:  The conduct which Mr. Feight engaged

6   in, as I said earlier, is distinct and distortedly different

7   from Mr. Crawford's.  Over his awareness of the plot, his

8   awareness that the intent was to kill innocent human targets

9   based on their religion, his participation in it over an

10  extended period of time without going to law enforcement,

11  his delivery to Mr. Crawford of a working operational device

12  that he said could easily be integrated into the system all

13  make for a very serious offense.

14           The Guidelines, we believe, accurately reflect the

15  seriousness of that offense and his decision to accept the

16  Government's offer of a statute that put a statutory cap

17  that fundamentally distinguishes his possible sentence from

18  that of Mr. Crawford, we believe appropriately, and

19  adequately reflects the difference in the behavior of the

20  two.

21           THE COURT:  Thank you.  Mr. Moschetti, please.

22           MR. MOSCHETTI:  Maybe, Judge, if it's all right,

23  I'll go through the 3553(a) factors that I think you should

24  consider when reaching a decision as to the proper sentence,

25  also addressing some of the things the Government said.

*USA v. Feight - 14-CR-12*

1            The background and character of the individual

2     before you is something I know the Court takes into

3     consideration.  3553 indicates that.  So, we know you have a

4     person that's a 57-year-old person; he and his wife, Connie,

5     were married in 1983, they have three girls:  Elizabeth, who

6     came from Germany and is here today; Rachael, who came from

7     New Hampshire and is here today; and Emily, who came from

8     North Carolina and is here today.  The girls have done well.

9     Unfortunately, this has been a two-and-a-half year process

10    where it's had an adverse effect on them.  That goes on

11    Eric's shoulders, there's no question about that, that's his

12    responsibility he put himself in.  Emily, who is a very good

13    student, while Eric was there and had a steady hand, she

14    excelled; since then, unfortunately, she has dropped out --

15    and I think there's a direct correlation -- she dropped out

16    and left home, that's high school, without him being there.

17            You saw the letters from the girls.  I think it

18    would be fair to say they were quite poignant and I think

19    quite important to describe the individual who the

20    Government now asks you to send to jail for 15 years.  He

21    was raised by his maternal grandparents.  The history that's

22    in front of you shows all through his life he's done

23    exceedingly well.  Went to college in Florida, went to the

24    State University of Florida, missed graduating by a

25    semester, went on to work, and everything he's done he's

*USA v. Feight - 14-CR-12*

```
 1   been successful in.  Letters we submitted I think all
 2   address that.  Tremendous work ethic, honest, reliable.
 3   It's a theme, it's a continual theme, that we didn't see
 4   anyone else bring anything that would indicate otherwise,
 5   because I think it's true and it resonates.
 6           He was a hands-on dad, the girls talked about
 7   that; he was involved in their school, with their homework,
 8   with their after-school activities.  When Mrs. Feight was
 9   dealing with health issues, he was cooking them dinner
10   almost every night.  And when you read the quotes from the
11   girls, how during their lifetime they have never seen their
12   father or hear their father say anything that was advocating
13   violence, that was violent, that indicated any hatred or
14   dislike of anyone.  I think Emily said what she was taught
15   throughout her life by her father was that she should treat
16   everyone equal.  I mean these aren't made up things; it's
17   the fabric of the person that is here before you.
18           We know that he was involved in charity most of
19   his adult life.  He was a volunteer for the Boy Scouts, and
20   he's been a member of the Elks forever.  And you got letters
21   from people from the Elks and from people who were
22   constantly involved, not for his own good, but for the good
23   of others in providing food and money for those that were
24   disadvantaged that needed it, both during the year and every
25   Christmas.  He raised money for students that needed tuition
```

1    that couldn't afford to go to school.  He got Emily involved

2    in the charity work, his daughter.

3            And so if you're thinking about what kind of

4    person this is, you're thinking he's trying to show his

5    children this is the way to live, this is what you should

6    do.  I think Rachael said he was the most honest and

7    kind-hearted person she's ever met.  Now these are his

8    children, I understand that, and they see that this is their

9    dad, but there were letters from others in the community

10   that said the same thing, although there was one individual,

11   I think you saw, who said this was the nicest, gentlest

12   person, but also the most naive person.  And I said in the

13   sentencing memorandum that's probably why he's sitting here,

14   unfortunately.

15           So, that's some of his background.  I have to say

16   certainly there's not any indication that he had a history

17   of being a zealot or being involved in some type of radical

18   group.  There is no evidence of that and the Government

19   hasn't produced anything of that.  We had wiretaps, searches

20   of his home, they went through all his computers, I'm sure

21   they interviewed everyone that was around him and dealt with

22   him.  Not one bit of evidence that he belonged to a group

23   that advocated the overthrow of government or was

24   terroristic in nature, that he held those views, that he

25   belonged to some associations.  And you know there's a

*USA v. Feight – 14–CR–12*

1    contrast certainly between the defendant Crawford and Eric

2    Feight that's pretty amazing and I know that you sat through

3    the trial and you have seen and heard things.  But with

4    respect to Eric, the things that Crawford was involved in

5    Eric Feight never had anything to do with.  They've never

6    owned a gun.

7              He never knew, and this I think there is no

8    dispute, he never knew that Crawford -- Crawford kept hidden

9    from him that Crawford was a member of the KKK and he didn't

10   know that the undercover agents or the investors were

11   supposedly involved with the KKK until January of 2014 and

12   not at the time that they met at the diner.  And what

13   happened in January of 2014 simply was, and you can see this

14   when you listen to the tapes or read the transcripts of the

15   tapes, because Eric was not cooperating with them, because

16   he was putting them off, Crawford was getting frustrated and

17   angry.  I'm not -- I don't have to -- we're not making this

18   up, it's part of the proof that they provided to us, and

19   it's part of the material that's in the presentence report

20   and may even be part of the material that you heard during

21   trial.  I did not sit through the entire trial, so I can't

22   comment on that.  But Crawford goes to Eric and says I gotta

23   tell you you can't mess with these guys, they're a part of

24   the KKK.  That's the first time that he had heard that.  So

25   it's not as if he knew all this information beforehand.

1    Most of this came either during or after.  He didn't find

2    out that Crawford was a member of the KKK until the agents

3    who arrested them I think told him that and he read it in

4    the paperwork that was submitted.  So, I think that's pretty

5    significant when we're talking about the individual who is

6    before you.

7              If you take what the Government wants you to

8    believe, that he was a true believer, a zealot, was into

9    this plan, tell me why it took him six months to deliver a

10   simple device that they concede could be made in a week, all

11   right?  Why?  If he is so gung ho with this, if he wants to

12   do this, if he's involved in the way they're trying to lead

13   us to believe, then why did it take that long period of

14   time?  I mean, they concede someone, and it didn't have to

15   be that sophisticated, but certainly someone with his

16   background could have produced what they wanted within a

17   week, all right, and would have, if you take their argument.

18   If he had been a zealot, if he had been so into this, if he

19   had wanted this to be accomplished, what would he have done?

20   He would have gotten the parts together, created these two

21   radios to communicate with each other, delivered it to them

22   and done what the most important part would be, is you have

23   to integrate -- and this is beyond me, the science hood, but

24   I think in it's simplest form you have to integrate the two

25   radios, a simple concept, the two radios communicate to each

1    other, that's the test that they did in May of 2013.  Yeah,

2    they can communicate with each other; it doesn't mean that

3    it can operate any machine, let alone this X-ray machine.

4    So what you would have to do to make those two radios

5    anything but useless is to integrate them into the machine

6    that they were producing for Crawford.  And he refused to do

7    that, absolutely refused to do that.

8         So, I think it's one thing to say yes, he was a

9    zealot, he was part of this group, he wanted to do this.

10   But if you look at the facts in which we should all make our

11   decisions here, the facts indicate otherwise.  And I think

12   the Government has conceded that, ya know, there was delay

13   after delay after delay.  When you read the tapes, you can

14   see them all, the agents are pressing, the investors are

15   pressing Crawford about what's going on with Eric Feight.

16   Crawford is telling them he's totally frustrated, he's

17   shocked, he's angry, he wants to groom someone else, all

18   right, because it's just delay after delay after delay.  And

19   when you read each section of the report that lays this out,

20   it becomes clear.  When you think about it, when you just

21   read through it, oh, you know, well it took longer than

22   you'd expect, but that's not the case and no one is saying

23   that.  There's no question there.

24        At the time of his arrest, the agents have said he

25   was honest, straightforward, cooperative, he helped them in

*USA v. Feight - 14-CR-12*

1  the execution of their search warrants because they were

2  looking for certain things, he directed them.  They asked

3  him questions and he answered them.  I mean, he did what I

4  would think you would expect him to do.

5          And then he's been in the jails -- Warren,

6  Washington, Rensselaer -- and you know the system certainly

7  better than I do, they move them around depending on when a

8  bed is available, for two-and-a-half years.  And he didn't

9  just sit in his cell during that period of time.  He created

10  Bible study classes in both Warren and Rensselaer County

11  when none existed.  I received a letter late, a day or two

12  ago, from someone in the outside community that is involved

13  in providing that guidance to inmates and they said he went

14  beyond what anyone in their group has ever seen.  So he

15  actually created those two programs, and I guess if we

16  wanted someone to do something when they're sitting and

17  waiting, that would be what we would want them to do.  He

18  certainly put his mind to it and accomplished it.  They even

19  asked him to teach a class to the inmates there in

20  industrial automation, so that's what he did, you know, he

21  taught so they could go out and better themselves later.

22  And I guess he also was a tutor for a large number of

23  inmates in all the locations in math, he was asked by the

24  administration can you help these guys, tutor them in math,

25  give them skills to go out and do that.  No one forced him

*USA v. Feight - 14-CR-12*

1    to do that, I certainly didn't tell him to do that.  He did

2    it on his own, of his own volition.  He even -- and I think

3    he may discuss this, but he even tried to start to rough out

4    a business plan so when he got out or gets out he can

5    resurrect what he had in place, which obviously was a very

6    successful business and business career, so that given the

7    opportunity, he can go back and try and make amends, both

8    with his family and to the community.  So I think that

9    speaks very highly.  So when you're determining what the

10   appropriate sentence would be, I think those characteristics

11   here are very, very important.

12           I view, when I look at this, and I've had a long

13   time to look at it and I've read all this material, I have

14   listened to tapes, both wiretap, consensual tape of

15   meetings, I view Eric's role -- and I believe it's true --

16   as minor.  And you can see right from the beginning, after

17   he realized that he had gotten himself in a fix when he went

18   to that diner, and I know and we've talked about this, he

19   said it was the worst mistake of his life going, he should

20   have never gone, but if you lay out what happened, you can

21   see the progression and the mistake.

22           In the summer of 2012, Crawford, who has a

23   reputation of not being very sophisticated, you probably

24   established that at trial, but is very persuasive.  He comes

25   to Eric.  They don't socialize, they know each other because

1    Eric is a general contractor who works at GE, that's where

2    they cross, so they don't socialize, their families don't

3    know each other, but Crawford pitches him, saying I have an

4    idea to create a system using radiation to radiate medical

5    waste and it can be global and brought from place to place,

6    hospital to hospital.  It's a commercial venture that I

7    think, you know, could be patented to make money.  So he

8    gets Eric's interest that way, and it remains so until the

9    fall of 2012, when Crawford then starts to talk about using

10   the device -- you know, we've had a lot of discussions about

11   this term, Muslim and then Muslim terrorist cells.  We asked

12   it be put in the plea agreement and the Government said no,

13   we are not gonna do that because that's been our position

14   from the beginning, but he pitches it in a way to sell it to

15   someone like Eric, saying, look, this is a device that can

16   be used against Muslim terrorist cells and, you know, I

17   think it's viable, I think you can do it.  Now Eric is

18   looking at him thinking this doesn't make any sense, I don't

19   think this is viable, it's not his area of expertise, but

20   just sounded like a crazy story.  Don't forget that we know

21   that Crawford pitched this device right to a Jewish

22   synagogue, or tried to, and tried to pitch the device to

23   another Jewish organization.  I'm sure Crawford didn't go to

24   them and say you know what, I've got a device that can be

25   used to kill innocent people, all right, and I want you to

1    help fund that for me.  Does anyone -- do they think that's

2    what Crawford was gonna do?  Of course not.  He's smarter

3    than that, in the sense that that's not gonna work with

4    people.  He's going to them saying here's this device that

5    might be able to be used against terrorists and, you know,

6    enemies against Israel and Jews, which I assume means

7    terrorists, all right, and I think that's a fair assumption.

8            He also tries to pitch it to United States

9    Congressman Chris Gibson, I don't know the details of that,

10   but I did see it in some of the materials provided, and I'm

11   certain he wasn't gonna pitch it to Congressman Gibson

12   saying I am gonna create a device we can use on

13   undesirables.  I think that's the way the Eric we know got

14   involved and I think all the discovery that I looked at that

15   I've been provided, the tapes, the written material, the

16   videos, the wiretaps, not once is there any reference

17   involving Eric, with Eric as part of that conversation,

18   about targets being just Muslims or people that are

19   undesirable or the President or the Governor or people that

20   Crawford didn't like.  Not one.  Not one.  They've never

21   produced it because it doesn't exist.  So why?  I mean

22   because they, and specifically Crawford, he doesn't want

23   Eric to be involved in that conversation at all because he

24   doesn't want him to know that, all right, he's kept totally

25   out of that.  And, I mean, the absence of any of that

```
 1   material proves that.  If he truly was so involved and that
 2   was his intent here, to do this, to create -- help create a
 3   weapon to hurt innocent people, why didn't they involve him
 4   in those discussions?  Why isn't there tape recordings about
 5   conversations regarding that?  Even at the diner, I read the
 6   transcript, I'm sure the Court has, I don't see discussions
 7   like that as to who the target is gonna be.  So I think to
 8   say that that was his intent and his knowledge and he knew
 9   that is not true and I think it's unfair.
10          Going to the diner, we said that, Eric said that
11   in his presentence report, I think he is gonna say that to
12   you today, you know he's goin' there thinking all right,
13   Crawford is crazy, this is crazy, but I'm gonna go, I'm
14   gonna take a look at these guys, just out of curiosity, I
15   don't believe the device is viable.  And he gets there and,
16   unlike Crawford, who, to him, is crazy but not dangerous,
17   the two investors seem deadly serious and sophisticated and
18   he realizes at this point that he has made a major mistake
19   because now he has been brought in, he's made aware of their
20   plan.  For him to show anything but "I'm okay with it and
21   I'm involved with it" means what?  His thought process,
22   they're gonna do bad things certainly to me and my family if
23   they think I'm not gonna be involved and I'm gonna go to the
24   authorities and do those things.  Is not going to the
25   authorities at that point in time, was that a mistake?  Huge
```

 1    mistake.  Does he wish he had done it, saying look it, these

 2    guys are crazy and I got myself into this guy goin' to this

 3    meeting but, ya know, this is what's goin' on?  Of course he

 4    should.  Sometimes though I think as human beings we get

 5    ourselves into situations and you get overwhelmed and you

 6    don't think like you should.

 7              And so Eric Feight is thinking all right, they

 8    know who I am, I'm gonna make 'em believe certainly that I'm

 9    in with the cause, and I want to try to extricate myself.

10    And he does that, he tries to do that, probably in the wrong

11    way, obviously the easier way was to go to the FBI or the

12    police, but by putting him off, right, fobbing them off, not

13    answering their texts, not answering their phone calls,

14    making up excuses, work, I'm sick.  I mean these are the

15    things he was telling them.  I've been sick with the flu,

16    work is overwhelming, I'm just slammed with work, I just

17    can't get to it.  I mean is that what a zealot, is that what

18    someone who says I want this to happen, I want innocent

19    people to be exposed to this device, is that what they do?

20    All right.  Of course not.  But if you don't think of it in

21    those terms, it seems like he gave them the device.  But if

22    you look at what he did, I mean December, January, February,

23    April, May, right, kept putting them off.  There were times

24    when they would try to e-mail him or text him, we want to

25    meet with you to discuss the progress, he refused to meet

*USA v. Feight - 14-CR-12*

1  with them.  Crawford tried to get him to meet with them to

2  demonstrate the two radios that were put together.

3  Absolutely refused to do that, I'm not gonna do that.  And

4  so you have this tug and pull.

5       And, of course, Crawford is smart at one point

6  'cause he's frustrated, said these guys have affiliations,

7  they're affiliated with the Ku Klux Klan -- we know there

8  was discussion about that -- and they're not to be messed

9  with, so get the device done.  And even then he has them go

10  out to get lights for a device that already has lights.  The

11  radios, they already have lights, total waste of time.  He

12  has them get parts that are never used, all right.  He gives

13  them the incorrect numbers, parts that are lacking numbers,

14  hoping that they're just gonna go away.  But they're

15  persistent with respect to the device.

16       To emphasize, I guess, it's hard because it's his

17  thought process, but to demonstrate that he actually was in

18  fear, when you look at the tape, he spoke with one of the

19  detectives in the task force, Detective Nafey, and

20  afterwards, when they're done, Eric says to Detective Nafey,

21  "Would you please give your cellphone number to Connie and

22  let them know to call you or 911 if these guys or someone

23  associated with them come to the house?"  And these guys,

24  meaning the investors who we thought -- now he knows -- have

25  all kinds of affiliations that aren't so nice, because he's

1    afraid, and he says, "I'm afraid.  I'm arrested, they're

2    gonna think I'm cooperating against them and they're gonna

3    reach out and try to harm my family."  So Nafey gives him

4    the cell number, Connie gets Nafey's cell number, they warn

5    her.

6           Then I think there is some discussion between the

7    agents, an hour or two goes by, and they say, look, the

8    family is gonna be upset, they're in fear.  They then tell

9    him those two investors were actually undercover agents so

10   there is no fear to have.  But why would he do that if he

11   didn't fear them?  You know, to me, that's direct evidence

12   of what was in his mind and I think it corroborates what I'm

13   saying.  It's part of the evidence in the case.

14          The Government, in its response, I think, to

15   Crawford's omnibus motion, talked about, I think there's

16   some dispute about without the radio the device wasn't gonna

17   be operative and the plan couldn't go forward.  Well, they

18   specifically say in their response it was -- the device

19   itself, operating it remotely was not necessary for the

20   function of it and wasn't necessary for the completion of

21   the plan.  And what Eric delivered to them certainly wasn't

22   gonna assist their plan in any way, and Eric will talk about

23   that in more detail, but I can address that also.  (Pause.)

24          So this is how I understand it:  The two radios

25   are purchased from RadioShack and I guess what happens, what

*USA v. Feight - 14-CR-12*

1    Eric did was, and it's a very simple thing to do, he gets

2    radio one to communicate with radio two and that's what ya

3    do.  And so it wasn't integrated to the device.  And you

4    know, the Government said he was shown a manual, but I

5    believe the truth is they were shown briefly a brochure, all

6    right, not one that had schematics that you could say, oh,

7    this is the type of device, I've got all the intricate

8    workings of this device, therefore, I can design a radio

9    device that can be integrated to this particular X-ray

10   machine and operate it.  Because, I mean, that's the whole

11   idea.  Well, he knows that can't be done unless you have all

12   that information and unless you integrate the receiving

13   radio to the machine.  The X-ray device itself, I think it

14   seems pretty clear, was not designed to be remotely

15   controlled, at least the one that they were proffering as,

16   you know, the one that was gonna be used.  So it wasn't like

17   you could call up the manufacturer and say, oh, can you send

18   us the remote for this?  So anyone having to operate it

19   remotely would have to integrate the two radios, all right,

20   in their simplest form, into the device.  And that would be

21   quite complicated and you would have to know to get the

22   correct radios and frequency involved 'cause you'd have to

23   know all that about the machine.  And when he delivers that

24   radio and says -- those radios and says I'm done, I'm not

25   getting involved, I'm out, and I think you may have heard

*USA v. Feight - 14-CR-12*

1   some of that in a tape, I think Crawford says to 'em

2   Feight's out, he's done, he's out, you know that was his

3   finally I gave 'em what they think I agreed to give 'em,

4   it's not gonna help them, but at least I can say I did it,

5   leave me alone, I'm out.  And I know that's not the right

6   thing to do.  I mean, if you wanted to do a renunciation as

7   a full defense, you would have to go and say to the folks,

8   the law enforcement folks, this is what they're doing.  And

9   he didn't do that.  You know, I know he beats himself up

10  about that every day.  Just an example.

11          And when you saw the video of the warehouse where

12  Crawford was and they have the machine, I think Crawford

13  expresses to the agents that he didn't want to turn it on,

14  you know, because he's too close to it, he's afraid of it.

15  Well, if they had the device they say they were given,

16  right, that Eric provided to them, just hook it up, hook up

17  and remotely control it, they could have done it.  But that

18  was not gonna happen and I think everyone knows there was no

19  way that was gonna happen.  Those two simple radios and

20  their relay system was never designed nor integrated into

21  the machine itself, so Crawford couldn't do that, nor could

22  the agents, nor could anyone else.  And so when we talk

23  about what he did and what he tried to do, I believe that

24  the evidence is pretty strong here that what he gave them

25  then was useless and they knew that, and he'll probably

1   describe that much better than I can.  They said that, you

2   know, I know Mr. Green said that Eric gave Crawford

3   information on how to hook up the machine, the two radios to

4   the X-ray machine.  That -- those instructions were totally

5   useless, you would have to have the panels, the schematics,

6   the inner workings of the machines to know how to do that.

7   That was just to placate them and placate Crawford and, in

8   fact, Crawford leaves the material that Eric gave him, he

9   just leaves it, forgets it, whatever, and Eric has it and

10  doesn't say to him or call him and say, hey, you left the

11  instructions that you wanted from me, here they are.  Eric

12  puts 'em in a bag and leaves 'em at his house and he tells

13  the agents, he says I wrote this stuff out, he left it, he

14  never took it and it's still there.

15          That doesn't really sound like someone that wants

16  to help them integrate the system and get the system up and

17  running.  Certainly, if that was the case, realistically he

18  would have gone there and done it for them or, at the very

19  least, tell them I need all the schematics, I have got to

20  look at the thing and be able to design the thing, otherwise

21  you have two radios that can't communicate to each other.

22          I know I've been long and I apologize, but it's

23  been two-and-a-half years and it's a 78-page presentence

24  report.  And you're right, I agree, the case is crazy.  And

25  I don't say that to diminish -- it's a serious case, there's

1  no question, but for this person that never entertained

2  hurting anyone his entire life and who exhibited that the

3  way he lived and the way he talked and the way he taught, to

4  sentence him to 15 years when he tried to get himself out,

5  that he did everything he could not to help them, and, in

6  fact, what he did is give them something that couldn't help

7  them, that wouldn't help them, I think that 15 years is much

8  too long and I hope the Court feels that way.  Thank you.

9          THE COURT:  Thank you.  Mr. Feight, you have the

10 last word.  You're not obligated to speak, but you have

11 every right to speak.

12          THE DEFENDANT:  Your Honor, thank you for

13 providing me the opportunity to speak on my own behalf.

14          In the early '80s, shortly after I left college, I

15 went to work for a small, family-owned bakery in

16 Schenectady.  From that point, until my arrest in 2013, I

17 put in a lot of long, hard work to build a successful career

18 as a control systems engineer, ultimately opening my own

19 business that I had employed three people with.

20          More important than my career has been my family.

21 My wife and I have been married for 32 years and, to this

22 day, she's still the love of my life.  We've raised three

23 beautiful, successful daughters that I can't even put into

24 words how much I love them, how much they mean to me.

25 Through volunteer work that I've done, through the school,

*USA v. Feight - 14-CR-12*

1   through the Elks lodge, other community organizations, I've

2   tried to do my best to give back to my community, while at

3   the same time teaching my daughters a strong work ethic and

4   a sense of service to others.  I think that's been reflected

5   in the letters that they've written, they really touched my

6   heart when I read what my daughters wrote about me.

7           Until my arrest in 2012 -- 2013, I had -- my worst

8   offense has been a traffic ticket.  I've never owned a

9   firearm or a weapon of any kind.  I've never been associated

10  with, a member of, or supported any type of militia or any

11  type of organization that promotes violence or hatred of any

12  kind at all.

13          I was initially approached by Crawford asking if I

14  would be interested in creating a remote control system for

15  a group of investors who had developed a system for

16  sterilizing medical waste.  This was gonna be mobile and

17  travel from hospital to hospital.  He said he couldn't give

18  me a lot of details because they were working on obtaining

19  the patent that they hadn't received.  I've never -- had

20  known Crawford at that point for several years just through

21  a work association, he was a maintenance worker at GE in

22  Schenectady where I, as a subcontractor, had done work on a

23  semi-regular basis.  He worked on a lot of the same machines

24  that I did controls on.  That's how we knew each other and

25  would see each other once in awhile.

*USA v. Feight - 14-CR-12*

1       The company that I had was in the business of

2   designing controls.  This seemed like a good business

3   opportunity, so I told him that I would be interested, and

4   we talked about this from time to time, ya know, over the

5   next few weeks.  Then a long period of time went by, I

6   really didn't hear anything back from him about it.  I

7   figured that, you know, this, like a lot of these

8   opportunities, had just died on the vine, so I didn't think

9   anything more of it.

10      Crawford approached me again in the fall of 2012

11  to let me know that the project was still on and if I was

12  still interested, which for the medical device, yes, I was.

13  And then, over the next several weeks, he began to, a little

14  bit at a time, reveal to me what he claimed to be the true

15  nature of this project, that I've come to -- was closer to

16  the truth, but, as I've come to learn since then, was still

17  a lie.  He told me that the mobile device was gonna be used

18  against terror cells that were operating within the United

19  States.

20      I tried pointing out to him that just from a

21  common sense standpoint this made no sense at all.  He told

22  me that this is a technology that had been around for over a

23  hundred years and I said that, well, if it's been around for

24  that long, why hasn't anybody, specifically terrorists,

25  thought of using it in this manner?  And the other point

*USA v. Feight - 14-CR-12*

1    that I made to him was that, ya know, if a device like this

2    can produce harmful levels of radiation, then it certainly

3    wouldn't be available on a commercial basis to be used in

4    and around the general public.  But he remained convinced

5    that this idea was plausible, that he had the ability to

6    make it work, and that he was the only one, in over a

7    hundred years, to ever have thought to use it in this

8    manner.  And although fighting back against terrorists

9    didn't seem like a bad idea, I certainly thought that this

10   was a farfetched idea that certainly seemed impossible.

11           As I continued to work on projects at GE during

12   that time, there was a lot of work going on there that

13   involved my company, he continued to press me every time he

14   saw me for assistance on this.  He finally convinced me to

15   meet with the other people that were involved in this, and I

16   thought, okay, these are just gonna be more people like

17   Crawford, you're crazy, and out of curiosity, to be honest

18   you, looking back on it I'm not even sure what motivated me

19   to go entertain these people, but he convinced me to go to

20   the meeting and I thought it was just gonna be more talk

21   about a crazy idea that they had no ability to put together

22   and it ultimately couldn't work in the first place.

23           Going to that meeting was the worst mistake I've

24   ever made, it's one that I'll regret for the rest of my

25   life.  The two people that I met with were not at all what I

*USA v. Feight - 14-CR-12*

1    thought they were gonna be; they were deadly serious, they

2    presented themselves as people who were committed to this

3    idea, and I quickly became aware that I placed my family and

4    myself in quite a bit of danger.

5              My fear for retaliation against my family is what

6    kept me from going to the authorities right away.  I realize

7    now that was a huge mistake.  They talked at that meeting

8    about several others who were involved in the project, so I

9    now knew that it was more than just the people that I was

10   seeing there.  Believing that this was an idea that couldn't

11   possibly work, I felt that the easiest way to get myself out

12   of this was to just ignore them and the whole thing would be

13   forgotten.  This proved not to be the case.  I tried my best

14   to ignore e-mails, phone calls and text messages.  Both the

15   undercover agents and Crawford continued to press me.

16   Crawford finally told me that my unresponsiveness was making

17   everyone nervous and, in his words, these aren't the kind of

18   people you mess around with.

19             I spent the next six months delaying the

20   construction of something that should have taken only a week

21   to do, and that was discussed in that meeting in Scotia.  In

22   addition to not returning phone calls, e-mails, text

23   messages, I made up excuses about parts that were missing

24   that weren't missing, I requested additional parts that

25   weren't needed, like lights, foregrips.  Had I actually

*USA v. Feight - 14-CR-12*

1   wanted to be part of this and was, ya know, part of the

2   cause and wanted to do this, I would have simply, through my

3   own business, ordered all of these parts and had this done,

4   tested and delivered by the end of November.  It's

5   inconceivable that someone with 25 years of automation

6   experience would take six months to build somethin' that has

7   fewer than a dozen parts.

8           At the November meeting, it was determined that

9   supplying the remote control was only part of what needed to

10  be done.  The more important part was to make modifications

11  to the control panel of the X-ray device so that the remote

12  control system could work with it.  Otherwise, the remote

13  control would be useless.  They stated that they didn't have

14  anyone else that had the capabilities to do that.  The fact

15  that I refused to do that more critical part, the important

16  part of what they asked me, was brought out in Crawford's

17  trial.

18          The remote that I finally supplied to them

19  after months of delay had no way of being directly connected

20  to the X-ray device.  I knew that in order to satisfy them,

21  get them off my backs, I had to provide something that

22  would show remote control capabilities.  In order to make

23  this system actually work, one of the two radios that

24  Mr. Moschetti talked about would have had to have been

25  mounted in the control panel for the device and integrated

*USA v. Feight – 14–CR–12*

1    with that control circuitry.  Instead of doing this, what I

2    did was I asked for an additional enclosure and more parts,

3    and produced a system that could only turn on and off a

4    simple 120-volt relay.  This is more proof that this system

5    was never intended to work with the X-ray device.  It was

6    only meant to turn on a simple 120-volt device, like a

7    light, when, in fact, at the meeting in November, they had

8    discussed the fact that this X-ray device was going to be

9    powered by 220 volts.

10           They never gave me any technical documentation at

11   all on the device.  The information that I was shown at the

12   diner was just a brochure, it had some pictures of an old

13   control panel, an old style control panel, that was it.  I

14   looked at it briefly and gave it back.  I'm not even sure

15   what we looked at was ultimately what Crawford picked out to

16   use.  I wasn't part of that, so I don't really know.

17           The concept here is similar to a universal TV

18   remote.  I can get a universal remote from RadioShack, I can

19   program it to operate my TV set to prove to you that it

20   works, but it's not gonna work with your TV unless I know

21   the details about your TV to program it to work with it.

22   And even more important than that, if your TV doesn't have

23   remote control capabilities, like the case with the X-ray

24   device, unless someone makes extensive modifications to the

25   circuitry of that device, no remote is gonna work with it.

*USA v. Feight - 14-CR-12*

1              I was never involved with or had any knowledge of

2    any other part of this operation other than just the remote

3    control device, that was all the discussions that Crawford

4    had with me.  Potential targets were never discussed with

5    me, other than just the generic approach that it was

6    supposed to be used against terror cells operating within

7    the United States.  The only other detail that he shared

8    with me was that he had approached a couple of Jewish

9    organizations who were interested in helping with the

10   funding of this plan.  And this, I have now come to learn,

11   like much of everything else he told me, was not quite true.

12   Even during the meeting in November, both Crawford and the

13   undercover agents were very careful to not reveal to me any

14   specific details of this plan.  The discussions were all

15   generic, you know, like a lot of other people, political

16   topics of the day, and no, no other details.

17              Having said all this, I still accept full

18   responsibility for all of my actions and my decisions.  I

19   should have never gone to that meeting in Scotia, I should

20   have never given these people any information or assistance

21   of any kind.  I should have gone directly to the authorities

22   as soon as I knew what Crawford's plans were.  I was wrong,

23   terribly wrong for what I did and what I didn't do.  I will

24   now have to live with and regret my decisions for the rest

25   of my life.  My actions that were intended to protect my

1   family have now harmed the ones that I love the most.  The

2   life that my wife and I have spent over 30 years of hard

3   work to build has been devastated.  Our home is in

4   foreclosure.  My youngest daughter, who was an honor student

5   and president of the local chapter of an anti-bullying

6   organization, has now dropped out of school without

7   completing her high school education.  The emotional harm

8   that I've done to my wife and my daughters can't even be put

9   into words.  This, along with the pain and guilt that I feel

10  over what may have happened if I was wrong and Crawford

11  actually could have put together what I thought was

12  something that was impossible to do, is something that I'll

13  have to live with for the rest of my life.

14          Although the county jails don't provide much in

15  the lines of a positive environment, I've done my best to

16  spend the last two-and-a-half years as productively as

17  possible.  I taught a class, although to a small audience,

18  on industrial automation, I taught a basic math class, I've

19  tutored several inmates who were working on their GED in

20  mathematics.  I've conducted Bible studies in Rensselaer

21  County and in Warren County.  Rensselaer County has more in

22  the line of Bible studies.  Warren County had little to

23  none.  It was a blessing to be able do that there.  While I

24  was in Rensselaer, I had almost completed a business plan

25  and, unfortunately, I was unable to bring with me when I

1    went to Warren County.

2              I'm very anxious to return home to my wife and to

3    my daughters to begin to repair the damage that I've caused.

4    With my experience and expertise as a control systems

5    engineer, I feel that if allowed to go home soon, I'll be

6    able to quickly re-enter the workforce and, once again,

7    contribute to my family and to my community.  Thank you,

8    your Honor.

9              THE COURT:  Thank you.  There are always

10   consequences, none than you feel more poignantly than you do

11   now, but you're right, the harm you caused your family is

12   all at your doorstep.  Ya can't lose sight of the fact that

13   you have admitted that you committed a serious crime and

14   that crime was intended to use a weapon of mass destruction

15   to kill people.  And while you may now, in the view of

16   hindsight, believe that such a weapon was never available or

17   never able to accomplish that which Crawford sought to do,

18   the truth of the matter is it could have been, it could have

19   accomplished what it was he sought to accomplish.  And while

20   you may bicker about whether it was terrorist Muslims you

21   had in mind or whether it was ordinary Muslims, the bottom

22   line is I heard your statement that was recorded on the wire

23   in Scotia, to the -- akin to I've sat and talked all my

24   life, it's now time for me to do somethin'.  You understood

25   what it was you were doin'.  You may not have appreciated

1    that it could have accomplished what it was, but you

2    appreciated what it was you were doin'.  That was part of

3    the agreement that you entered and it is something that you

4    intended to do, as you have admitted to me with your plea.

5           So you can't sit here in hindsight analysis and

6    say, well, it was never gonna happen.  It could have

7    happened.  And had it happened, you would have played an

8    instrumental role in its happening, and the only reason it

9    wasn't gonna happen is because the people you were dealing

10   with was not who you thought they were.  Had they been of

11   that caliber and of that character, who knows who would have

12   been harmed by this machine.  It's all bizarre, as I said at

13   the outset.  It's bizarre that somebody of your background,

14   your intelligence and your life's experiences, all of which

15   I accept, would be listening to Crawford's nonsense and buy

16   into this, where there was a possibility of serious, serious

17   consequences.

18          And there's a penalty to pay for that.  That is

19   serious conduct and there is a penalty to pay for it.  I

20   accept the fact that at some point in this you realized

21   you'd bitten off more than you wanted to chew and you were

22   tryin' to distance yourself from it, I accept that.  That's

23   the way in which I viewed the evidence that I heard at the

24   time of the trial.  That's why I asked the Government to

25   address the issues I asked the Government to address because

*USA v. Feight - 14-CR-12*

1   I've got to place this all in some perspective, in some

2   balance.

3           While I have found that the Guidelines are

4   correctly scored, given the way in which I evaluate the law

5   that was the substance of the argument between the two

6   sides, it's not the resolution of the law that's the

7   resolution of this case.  The question is:  Is that, then,

8   the appropriate sentence in light of all the factors that I

9   have to consider, which is your background, the things

10  you've done in your life, the things you've done to commit

11  this crime, the seriousness of the crime and to provide some

12  balance to that.

13          That's why I suggested at the outset that while

14  the Guidelines are correctly scored, and this is 360 months

15  to life, that's far too harsh a sentence, in light of my

16  evaluation of those factors.  Instead, I believe the

17  advisory Guideline range without that enhancement is the

18  right range, as I evaluate those factors, including the

19  seriousness of the crime, the public harm that would have

20  been committed had it gone to fruition and all of those

21  other factors, including your background and your history.

22  And, therefore, to me, an appropriate range is 97 to

23  121 months, and I impose a sentence of 97 months.

24          I impose a term of supervised release of three

25  years, under the general conditions that have been adopted

*USA v. Feight - 14-CR-12*

1  by the district, incorporating the special condition number

2  one that I've supplied in writing.

3        I impose the special assessment of $100, which is

4  due and payable immediately.

5        You've consented to the entry of forfeiture and I

6  order that, consistent with the preliminary order of

7  forfeiture.

8        I impose no fines that, in light of your family

9  situation and otherwise, would just cause additional

10  hardship to your family.  In light of my evaluation of the

11  presentence report, no such fine or other costs are

12  appropriate.

13        You have waived your right to appeal any sentence

14  of 180 months or less; this is less and, therefore, you've

15  waived your rights in that regard, but if you have any

16  questions, you should discuss them with Mr. Moschetti, I'm

17  sure he would explain that to you.

18        Anything further on the part of the Government?

19        MR. GREEN:  Not at this time, your Honor.

20        THE COURT:  Government wish to impose an objection

21  to my variance?

22        MR. GREEN:  We --

23        THE COURT:  I want to give you the opportunity to

24  preserve the record.

25        MR. GREEN:  Yes, we do.

*USA v. Feight - 14-CR-12*

1        THE COURT:  All right.  Mr. Moschetti, anything

2   further on the part of the defendant?

3        MR. MOSCHETTI:  No, thank you, your Honor.

4        THE COURT:  All right.  I wish you well.

5             (This matter adjourned at 10:20 AM.)

6                  - - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*USA v. Feight - 14-CR-12*

1                  CERTIFICATION OF OFFICIAL REPORTER

2

3

4            I, THERESA J. CASAL, RPR, CRR, CSR, Official

5    Realtime Court Reporter, in and for the United States

6    District Court for the Northern District of New York, do

7    hereby certify that pursuant to Section 753, Title 28,

8    United States Code, that the foregoing is a true and correct

9    transcript of the stenographically reported proceedings held

10   in the above-entitled matter and that the transcript page

11   format is in conformance with the regulations of the

12   Judicial Conference of the United States.

13

14           Dated this 20th day of January, 2016.

15

16           **/s/ THERESA J. CASAL**

17           THERESA J. CASAL, RPR, CRR, CSR

18           FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25